liMAX N. TOBIAS JR., Judge.
On 6 July 2001, the defendant, Jonna L. Haynes (“Haynes”), was charged by a bill of information with armed robbery, a violation of La. R.S. 14:64. Haynes pled not guilty at arraignment on 12 July 2001. A hearing on defense motions was held on 24 *655 August 2001, and the court denied the motion to suppress the identification and found probable cause. A jury found the defendant guilty as charged on 4 March 2002. The state filed a habitual offender bill of information pursuant to La. R.S. 15:529.1. On 24 May 2002, the trial court denied Haynes’s motion for new trial and motion for post-judgment verdict of acquittal. A hearing on the multiple bill was held the same day. After hearing the evidence, the trial court found Haynes to be a third felony offender and sentenced him to life imprisonment without the benefit of parole, probation, or suspension of sentence. Haynes’s motion to reconsider sentence was denied. The motion for appeal was granted.

STATEMENT OF FACTS

Shortly before noon, on 11 June 2001, Curtis Aubry went to an automobile body repair shop on Saint Roch Avenue to retrieve his vehicle. Mr. Aubry parked Ijiis rental car, a white Mitsubishi Montero, an SUV, on the median. He was standing at the rear of the vehicle with the tailgate of the SUV raised, straightening up his personal belongings before transferring them to his personal vehicle. He was nearly finished when someone walked up behind him and put his left arm around his neck. The perpetrator held a gun at Mr. Aubry’s side and said, “Give me all your money.” Mr. Aubry turned and looked at the perpetrator in the face, which was covered by a ladies stocking that the perpetrator had over his head. Mr. Aubry told his assailant essentially that everything he had was there in the back of the truck. Specifically, the victim’s jewelry, consisting of two rings, a watch, and a bracelet, as well as a bank envelope with five hundred dollars in it, were in a small plastic bucket in the back of the car. The perpetrator grabbed the bucket as well as the keys to the SUV and pushed Mr. Aubry back. The perpetrator walked to the front of the vehicle and told the victim to get back. As he did so, he raised the stocking halfway up in order to speak. With the rear tailgate still open the perpetrator drove off in the vehicle.
When the police arrived at the body shop, Mr. Aubry met with a detective and provided a description of the perpetrator as being brown to dark complexioned, in his mid to late twenties, approximately 210 pounds, and somewhat taller than he. Mr. Aubry stated that he was 5' 9" tall. Mr. Aubry stated that the perpetrator was wearing knee length jeans and a dark colored T-shirt.
Officer August Michael was on patrol when he received a radio dispatch describing the white Mitsubishi Montero. Shortly thereafter, Officer Michael and his partner observed the vehicle on North Miro Street crossing Congress Street. They turned onto North Miro, and the Montero started to speed off. Officer Michael initiated pursuit with his lights and siren on. The chase ensued for several | ¡¡blocks until the Montero failed to negotiate a right turn at a high rate of speed and crashed through a fence and into a support beam of a carport. Officer Michael and his partner were approaching as the subject fled from the vehicle and jumped over the fence and into a backyard. Officer Holmes stated that he observed Haynes strike his head on the support beam as he fled. Officer Michael observed the subject from the rear, and stated that he was wearing a white t-shirt and blue jean shorts. Officer Michael ran into the backyard, but he lost sight of the perpetrator.
Officer Michael radioed for a canine unit and, with the assistance of other units the officers, were able to set up a perimeter with a one-block radius. After the canine unit arrived, Officer Michael showed them where to begin the search. The dog led *656 the officers into an adjoining yard and then into a “washateria” behind an apartment complex. A small door led to a crawl space behind the dryers where the officers observed Haynes’s shoe sticking out from behind a dryer. After breaking down a sheetrock wall, the officers took Haynes into custody.
The majority of the victim’s personal belongings were recovered inside the vehicle. Apparently, they were in some disarray. The victim’s jewelry and money, all of which had been contained in the small plastic bucket, were not recovered. A nine-millimeter semi-automatic pistol was recovered on the passenger side floorboard of the car. Additionally, a ladies stocking was recovered from the support beam hanging from a wood splinter. The victim was transported to the scene where he identified Haynes. The victim also identified the gun as the one used in the robbery.

\ ¿ERRORS PATENT

A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR

In his sole assignment of error, Haynes argues that the trial court erred by denying the motion to suppress the identification. A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentification existed as a result of the identification procedure. State v. Prudholm, 446 So.2d 729, 738 (La.1984) State v. Valentine, 570 So.2d 533 (La.App. 4 Cir.1990). One-on-one confrontations between the suspect and the victim, while not favored by law, are generally permissible when the accused is apprehended within a short time after the offense and is returned to the scene of the crime for an on-the-spot identification. State v. Robinson, 404 So.2d 907, 909-910 (La.1981). Such a process assures reliability and fosters prompt release of innocent suspects. Id.
Even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 932. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517.
|fiThe U.S. Supreme Court has set forth a five-factor test to determine whether a suggestive identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite, supra; Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Higgins, 01-368 (La.App. 5 Cir, 10/18/01), 800 So.2d 918; State v. Clennon, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164. A trial court’s determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Bickham, 404 So.2d 929 *657 (La.1981); State v. Offray, 2000-0959 (La.App. 4 Cir. 9/26/01), 797 So.2d 764.
Under the present circumstances, given the fact that Haynes was apprehended after a high-speed chase shortly after the crime was committed, it was reasonable, appropriate, and logical to attempt to secure an identification immediately. See State v. Carter, 99-2234 (La.App. 4 Cir. 1/24/01), 779 So.2d 125.
Haynes alleges that the identification was unreliable based in part on the fact that he was not wearing a dark colored t-shirt as described by the victim. Nevertheless, Haynes’s pants, jean shorts, did match the description provided by the victim, and the victim identified the pants as those worn by the perpetrator.
Haynes also suggests unreliability based on the fact that his physical characteristics do not match those of the perpetrator. Based on support from the | ^record, Haynes alleges that he is seventy pounds heavier than the person the victim described. The police report prepared by Officer Michael contains a physical description of Haynes as being 6' 2" and 270 pounds. Officer Michael testified that this was the information supplied by the police computer. No independent evidence was introduced at trial to establish Haynes’s actual weight or height.[1] Based on the information that Officer Michael retrieved from the police computer, Haynes also states that he is much taller than the person described by the victim. Again, no independent evidence of Haynes’s actual height was established during trial. Mr. Aubry stated that he was 5' 9" and described his assailant as being taller than he but only slightly so.
Despite the apparent discrepancy, the circumstances of the identification reflect that the victim had an ample opportunity to assess the defendant’s height. After the victim initially identified Haynes while he was seated in the back of the police car, the officers removed Haynes from the car in an effort to ensure the reliability of the identification. Mr. Aubry testified concerning this second identification as follows:
A. * * * They took him out of the car and he stood up there. And I walked directly up to him and I said yes.
Q. How close did you walk up to him? And assume that—
A. I walked up to him as close as I am to this fellow here (indicating).
Q. Okay. And, Mr. Aubry, did you get a good look at him at that point?
A. I did.
Q. Okay and did you identify him?
A. I definitely did.
17Pespite the fact that Mr. Aubry testified that the perpetrator was only slightly taller than he, he was nevertheless definite that Haynes was the perpetrator after he observed him standing before him.
Haynes further alleges that the identification was unreliable as the ladies stocking on his head obscured the perpetrator’s face. Mr. Aubry made several statements during trial relative to his ability to observe the perpetrator’s facial features both through the stocking and after it was raised as follows.
A. * * * And when I seen the gun and I turned around and I looked at him in the face as I’m looking at the Judge like this, and then he said, “Give me your money.” * * *
*658 [[Image here]]
Q. Okay. Prior to him entering into the vehicle, did he have something on his head?
A. Yes, he had—
Q. What did he have on his head?
A. He had a stocking over his head.
Q. Okay. Prior—
A. And just before entering the vehicle, he raised it up halfway about like this level (indicating) when he told me to get back.
Q. And when he raised the stocking cap, were you able to get a good look at his face?
A. A closer look at his face. [Mr. Au-bry was standing at the rear bumper of the car at this time.]
[[Image here]]
Q. Now let me ask you this: At the point where he had you from behind around the neck, did you have the occasion at that point to turn around and see his face?
A. When I glanced at his face, he still had the stocking on it.
IsQ. Okay how close were you?
A. And I was like this (indicating)
Q. So you were face-to-face?
A. Yes, I was definitely up on him.
Q. Okay.
A. He was definitely in my face, you see?
[[Image here]]
Q. Now when we [sic] had the stocking on and you were face-to-face with him like this, were you able to make out his face?
A. As much as I can make out yours.
[[Image here]]
Q. Okay. The person had a stocking mask on when he had the — when he was behind you?
A. Yes.
Q. So you did not get a good look at his face?
A. I did good enough.
Q. Through the stocking?
A. I was able to see his complexion. He had a full face. He didn’t have a like a skinny, narrow face, or nothing of that nature.
Q. Did you get a look at whether he had facial hair?
A. The stocking was covered. He either had close hair or a bald head.
Q. Did you get a look at any of his characteristics of his teeth?
A. No, he talked with a dim — his mouth was sort of closed.
Obviously, the victim’s ability to identify the perpetrator was impaired by the stocking over the perpetrator’s face; however, the victim’s testimony admits this fact. The identification was based on observing Haynes’s features through a 1¡¡stocking and then when it was partially raised. This fact was plain for the jury. We do not find that the trial court erred in denying the motion to suppress on that basis. The victim stood face-to-face with a man with a stocking over his head. Subsequently, the man raised the stocking up halfway. That was the basis of the identification. That was the question for the jury to consider. Certainly the perpetrator was more difficult to identify than had his face been uncovered, but this fact does not render the perpetrator unidentifiable.
Finally, Haynes suggests that because some of the victim’s property was not recovered, the evidence would tend to suggest that someone else committed the *659 crime. While the hypothesis is plausible, the circumstance of unrecovered property is not dispositive. Other circumstantial evidence also militates in the opposite direction. Notably, Officer Michael testified that the Mitsubishi Montero began to speed away upon the first sight of the police car. The flight and reckless nature of the chase itself is also indicative of guilt. Another significant piece of evidence was the recovering of the ladies stocking on the carport support beam, hanging from a splinter as if plucked from the top of the perpetrator’s head. The recovery of the gun within the vehicle is also significant. Furthermore, that Haynes was in possession of the stolen vehicle within a short time after the robbery also suggests that he was the perpetrator.
Mr. Aubry’s opportunity to view the perpetrator began with a face-to-face confrontation, and ended when Haynes raised the stocking and spoke to him. Mr. Aubry displayed a high degree of attention during the robbery, his level of certainty was great and a brief period of time elapsed between the robbery and the apprehension. Although the victim’s description admittedly contained a discrepancy, viewing the totality of the circumstances surrounding Haynes’s 1 inapprehension, identification, and arrest, it appears that no substantial likelihood of misidentification occurred in this case.

CONCLUSION

Accordingly, Haynes’s conviction and sentence are affirmed.

AFFIRMED.

. The record on appeal contains two arrest registers dating from 1998 and 1999 that re-fleet Mr. Haynes's weight as 215 pounds.