JjMOON LANDRIEU, Judge Pro Tempore.
STATEMENT OF CASE
The State filed a bill of information on August 13, 2002, charging Jeffery C. Ford with attempted aggravated rape in violation of La. R.S. 14:27(42).[1] At his arraignment on August 19, 2002, he entered a plea of not guilty. The trial court found probable cause, and after a hearing on February 10, 2003, the motion to suppress the identification was denied. A twelve-member jury found Ford guilty as charged after a two-day trial on February 11 and 12, 2003. He was sentenced on February 28, 2003 to serve forty years at hard labor without benefit of probation, parole, or suspension of sentence. Ford’s motion for an appeal was granted.
For the following reasons, we affirm the defendant’s conviction and sentence.

STATEMENT OF FACT

A.C., the victim, testified at trial that about 1 a.m. on June 8, 2002, she and five colleagues, who were visiting New Orleans, stopped in the Pizzooria in the French Quarter. As her Mends took a table, she told them she was going to the bathroom. She walked down a narrow hallway, and when she opened the |2bathroom door, she realized that a man was right behind her. He entered the bathroom and locked the door. He said, “Shut the fuck up or I’m going to kill you” and grabbed her head and began knocking her against the wall. She pleaded with him not to hurt her, and he repeated his threat to kill her. He put his hands on her neck, pushing her against the wall, and she fell hurting her elbow. The defendant unzipped his pants and ordered her to move her skirt. However, she was wearing a “skort,” shorts that look like a skirt but that cannot be pulled up like a skirt. He got on top of her trying to insert his penis into her, but her clothing was in the way. She described him as very angry and herself as very frightened. When she moved her skort, “there was contact” but he did not penetrate her. She heard someone knocking on the door, and began screaming for help. The defendant again threatened to kill her. Trying to sound like a woman, he said to the person knocking, “I’m fucking peeing. Go away.” The person knocking left, and the defendant again tried to penetrate her. The knocking began again, and she began to scream. The defendant, who had gotten up and had his ear to the door, told her to “[pjretend your [sic] fucking peeing.” He opened the door and as he stepped out, A.C. rushed out the door. She saw her friends and began to cry. She described herself as bruised on her elbow, knee, and-leg, and bleeding from her cuts on her face and head.
She remembered that the defendant was wearing a fisherman’s hat, baggy shorts that came to mid-calf and a red shirt. He had high cheek bones and was slender. She stayed at the pizza parlor with her friend, Larry Shapiro, after her assailant left. About ten minutes later, Glen Wahl, another colleague, returned to the restaurant to get her so that she could identify the defendant. When the officers 13took a suspect from a police car and she saw his face, she “just went crazy” and began screaming at him.
*838 Four of A.C.’s colleagues testified. Larry Shapiro explained that they work at the same law firm and were in New Orleans for an internal firm meeting at the Ritz-Carlton Hotel. The group was walking down Bourbon Street toward Canal Street when they decided to go into a pizza parlor for a snack. Shapiro bought a hot dog from a vendor on the street while the rest of the party entered the pizza parlor and ordered. He went into the parlor and sat at the table with the group. Someone noted that A.C. had been in the bathroom for a long time. Christine Huebner went to investigate, and she returned to tell the group that she heard someone say, “I’m fing peeing.” Shapiro responded that A.C. would not say that, and he arid 'Christine walked back to the bathroom. When Christine knocked on the door, it opened and a man walked out. He said, “Everything’s cool,” as he walked past Shapiro. A.C. was behind him crying. Shapiro realized that something was wrong, and he turned to his friends who were about ten feet away and ordered them to “[g]et” the man. A.C. ran to Shapiro and collapsed; he described her as “weeping uncontrollably” and hyperventilating. She said, she had been choked until she could not breathe and her head had been hit against the wall and the floor repeatedly. Shapiro noticed red marks on her neck, bleeding cuts on her head and lips, and swollen eyes. Her clothes were disheveled. Shapiro asked a restaurant employee to call the police.
Christine Huebner told the court of knocking on the bathroom door and hearing a “very high voice” saying “[g]o away. I’m fucking peeing.” Some moments later she returned to pound on the door and call to her friend by name. An employee of the restaurant asked her if she wanted a key to the bathroom, and |4she answered affirmatively. Just then the door opened, and Huebner saw A.C. first. She was shaking uncontrollably and her face was bloody. Huebner pushed A.C. off to Larry Shapiro, who was next to her, and she grabbed the man behind A.C. by the shirt. She held onto him for about thirty seconds and told him he was not leaving. However, she realized he was taller than she and could harm her, and so she let go of his shirt. She called to the men she was with to catch the man. Huebner turned to A.C. and asked her if she had been raped. A.C. answered, “No. He tried to.” Shortly thereafter, Huebner went to Canal Street to identify the attacker. She looked into the back of the police car and saw there the same man she had seen exiting the bathroom at the pizza parlor.
Thomas May and Fred Adams, both members of the law firm group, testified that they were sitting in the pizza parlor when they realized that A.C. had been attacked and the man was leaving the building. They began chasing the man down Bourbon Street and then across Canal Street. Both described the man as wearing baggy shorts and a big shirt. Adams caught the man and struggled with him until the police arrived. Both Adams and May' testified that they never lost sight of the defendant, and that there were no friends of the defendant with him when he was apprehended.
. Dan McCluskey, the manager of the pizza parlor/bar at 200 Bourbon Street, testified that he was on duty on June 8, 2002 when the incident at issue here occurred. He was in an office and did not observe anything. He called the police to report an attempted rape. The tape of the telephone call was played for the jury.
Detective Brian Baudier of the Sex Crimes Unit testified that he investigated an attempted rape on June 8, 2002. He went to Canal and Baronne Streets where the alleged offender was being held. As *839 the detective arrived on the scene, the | svictim was being escorted to the police car to identify the man being held there. The police officers had him step out of the car and she lunged at him while making a positive identification. The victim had “blood spatters” and some swelling on her face. The detective went to the establishment at 200 Bourbon Street to photograph the scene. He noticed red spots on the bathroom floor.
Officer Glen Blanche testified that he was driving on Canal Street when he saw two men fighting and another man flagging him down. He stopped and handcuffed both the men who were fighting. He described Ford as wearing a black shirt and black shorts with colored stripes. He was carrying no weapons. After Jeffery Ford was arrested, his picture was taken at Central Lockup. That picture was shown to the jury. He had a “slight mustache and hair on the chin” and gold teeth.
Linda Ford, the defendant’s mother, testified that she, her son and his friends went to the Superdome the night of June 7, 2002 to a fair. About midnight they walked down Canal Street, and at Bourbon Street she left them to return home. Her son and his friends intended to go to Chris Owens’ Nightclub. She testified that her son had on a red shirt and black pants with silver trim on the side that night. When shown a black shirt that he was wearing when arrested, she said that she did not recognize it.
Joseph Duplessis, an eighteen-year-old friend of the defendant, testified that he is a student at O. Perry Walker High School and that he has known the defendant since fourth grade. Duplessis described going to the fair at the Superdome with the defendant and his mother. Then he and Jeffery Ford went to Chris Owens’ Club to listen to music, and after standing in front of the club for about twenty minutes, they got change for the bus and went to Canal Street to |ficatch the bus. Jeffery was walking behind Joseph counting his change when Joseph heard the change fall. He turned around to see three white men beating Jeffery. Joseph panicked and began looking for Jeffery’s mother but could not find her. Joseph denied having anything alcoholic to drink that night or going into an establishment at 200 Bourbon Street.
Cedric Abron, a twenty-one year old friend of the defendant, testified to the same facts as Joseph Duplessis. However, on cross-examination, when asked if he remembered his testimony at the preliminary hearing where he said Jeffery Ford was arrested in front of Penny Land on Royal Street at about 3:00 to 3:30 a.m., Abron said he had been mistaken earlier and that Jeffery was attacked on Canal Street at an undetermined time.

ERRORS PATENT

A review of the record reveals no errors patent.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1

Ford first argues that the trial court erred by denying the motion to suppress the identification.
In a recent opinion, State v. Haynes, 2002-1648 (La.App. 4 Cir. 4/30/03), 847 So.2d 653, this Court considered a similar issue and stated:
A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentification existed as a result of the identification procedure. State v. Prudholm, 446 So.2d 729, 738 (La.1984) State v. Valentine, 570 So.2d 533 (La.App. 4 Cir.1990). One-on-one confrontations between the suspect and the victim, *840 while not favored by law, are generally permissible when the accused is apprehended within a short time after the offense and is returned to the scene of the crime for an- on-the-spot identification. State v. Robinson, 404 So.2d_[¿907, 909-910 (La.1-981). Such a process assures reliability and fosters prompt release of innocent suspects. Id.
Even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the- suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 932. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517.
The U.S. Supreme Court has set forth a five-factor test to determine whether 'a suggestive identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite, supra; Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Higgins, 01-368 (La.App. 5 Cir, 10/18/01), 800 So.2d 918; State v. Clennon, 98-1370 (La.App. 5 Cir. 6/30/99), .738 So.2d 161, 164. A trial court’s determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Bickham, 404 So.2d 929 (La.1981); State v. Offray, 2000-0959 (La.App. 4 Cir. 9/26/01), 797 So.2d 764.
In instant case because Ford was apprehended after.being chased two blocks immediately after the commission of the crime, it was reasonable and appropriate to attempt to secure an identification immediately. See State v. Carter, 99-2234 (La.App. 4 Cir. 1/24/01), 779 So.2d 125.
IsLooking at the Manson factors, it appears there is no likelihood of misidentifi-cation. First, the victim, who testified that the incident lasted about fifteen minutes, had ample time to view her assailant; furthermore, Larry Shapiro and Christine Huebner also saw him leaving the bathroom. Thomas May and Fred Adams saw him walking out of the restaurant and chased him, never losing sight of him until he was apprehended. Second, as to the degree of attention, A.C. was,inches away from her assailant in a small bathroom for fifteen minutes, and her testimony indicates she paid very close attention to him.
Third and fourth, as to the accuracy and certainty of the description, all the witnesses, State and defense, described Ford as wearing baggy shorts and a red shirt.[2] The victim remembered that he was wear *841 ing a fisherman’s hat and a red shirt. Larry Shapiro thought the assailant was wearing two shirts, one over the other, and one was red; he also remembered a hat pulled over the eyes. Christine Huebner identified a red and white shirt and a floppy, white sailor’s hat. She saw it fly from his head when he started running. Moreover, the defendant’s mother described his clothing as a red shirt and black pants with silver trim. Joseph Du-plessis agreed that Ford was wearing a red shirt, black pants, and a white “Kan-go” hat with a brim that encircled his head. None of the State’s witnesses remembered the defendant’s having any facial hair, gold teeth, or a tattoo. However, Ford testified her son had a small amount of hair on his chin and a thin mustache not shaped all the way across his lip. She said that he always shaves his facial hair “real neat and thin.”
|9The last of the Manson factors is the length of time between the crime and the confrontation. The victim testified that only ten minutes elapsed between the time she was freed from the bathroom and her friend Glen told her that the police wanted her to make an identification.
Thus, a review of the Manson factors indicates that the identification process was reliable.
In his brief, the defendant bases his misidentification argument on the fact that none of the witnesses noticed his gold teeth, facial hair, and tattoo, or that his black shorts had silver trim on the side. However, all the witnesses agreed that the defendant was wearing baggy shorts, a red shirt, and almost all noted the floppy hat. His picture at the time of his arrest was shown to the jury who was aware of the discrepancies in the descriptions. Furthermore, as noted above, his mother testified that he shaved his facial hair so that it was very thin. Accordingly, it does not appear that the witnesses’ failure to note the specific characteristics named by the defendant outweighs their positive identification testimony. The trial court did not err in denying the motion to suppress.
There is ho merit in this assignment.

ASSIGNMENT OF ERROR NUMBER 2

The defendant next argues that the evidence was insufficient to support his conviction for attempted aggravated rape. Rather, he maintains that the evidence is sufficient only for a verdict of attempted forcible rape.
When assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt as to each of the essential elements of the crime | incharged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, the evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred from reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
*842 La. R.S. 14:42, aggravated rape, is defined as:
a rape committed upon a person sixty-five years or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists, the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
An attempt occurs when a person has the specific intent to commit a crime and does an act tending directly toward the accomplishing of his object. La. R.S. 14:27.
In the instant matter, it appears the evidence was sufficient under La. R.S. 14:42(1) and (2). The victim resisted the defendant, and he pushed her down. He h unzipped his pants, took out his penis, got on top of her, and tried to penetrate her. She testified that she was threatened with death and actually injured.
In his brief, the defendant argues that this case is similar to State v. Parish, 405 So.2d 1080 (La.1981), where the defendant charged with attempted aggravated rape was convicted of attempted forcible rape. That case involved a man entering a woman’s apartment on the pretense of getting change for the laundry and then seizing her, threatening her, and dragging her toward the bedroom. . However, in Parish the defendant changed his mind .before reaching the bedroom and simply left the apartment. The Supreme Court considered the fact that the woman had not been fondled or subjected to any sexual indignity and the man had .• not unzipped his pants; the court held that attempted forcible rape rather than attempted aggravated rape was the proper conviction. The court noted that the two crimes are “virtually identical” and that the only distinction between the two is the “degree of force employed and the extent to which the victim resists.” . Id., 405 So.2d at 1085.[3]
State v. Parish can be distinguished from the case at bar in that Parish never unzipped his pants or took them off and did not get on top of the victim; he did not touch her breasts or genital area. Id., 405 So.2d at 1086. In contrast, Jeffery Ford did subject his victim to sexual abuse: he knocked her down on a dirty bathroom floor, got on top of her, and attempted to rape her. He also beat her head against the floor and choked her. Only Huebner’s continual knocking on. the bathroom door kept him from completing the sex act.
• |i?As the State points out in its brief, this Court upheld a jury verdict of attempted aggravated rape where the defendant broke into the victim’s apartment, beat her, dragged her into the bedroom, threw her on the bed, exposed his penis, and demanded she remove her underwear. State v. White, 621 So.2d 884 (La.App. 4 Cir.1993). He then made lewd statements to her as he fondled himself. He continued to beat the victim in the head and threatened to .kill her. When the defendant argued that the evidence supported a finding of attempted forcible rape, this Court stated:
it is within the province of the jury to determine the degree of force employed *843 in a particular case and to determine whether the act constituted aggravated, rather than forcible rape.
Id., 621 So.2d at 888.
As in the instant case, the jury had the responsive verdict of attempted forcible rape before it in White but found that the degree of force used amounted to attempted aggravated rape.
Viewing the evidence in the case at bar in the light most favorable to the prosecution, it appears that any rational trier of fact could have found the essential elements of attempted aggravated rape.
There is no merit in this assignment.

ASSIGNMENT OF ERROR NUMBER 3

The defendant next argues that the trial court erred in not instructing the jury about penalties for aggravated and forcible rape.
However, the well-established rule concerning such jury instructions was stated in State v. Jackson, 450 So.2d 621, 633-34 (La.1984):
When the penalty imposed by the statute is a mandatory one, the trial judge must inform the jury of the penalty on the request of the defendant and must permit the defense | 13to argue the penalty to the jury. State v. Hooks, 421 So.2d 880 (La.1982); State v. Washington, 367 So.2d 4 (La. 1978). In instances other than when a mandatory legislative penalty with no judicial discretion as to its imposition is required following verdict, the decision to permit or deny an instruction or argument on an offense’s penalty is within the discretion of the trial judge.
In the case at bar, neither the statutes for attempted aggravated rape nor those for attempted forcible rape provide for a mandatory penalty. The sentence for attempted aggravated rape is ten to fifty years without benefit of parole, probation, or suspension of sentence, and for attempted forcible rape, it is not less than two and one half nor more than twenty years with at least one year imposed without benefit of parole, probation, or suspension of sentence. Thus, because there was no mandatory sentence, the trial court had the discretion to deny the defense’s request for jury instructions as to the possible sentences involved.
There is no merit in this assignment.

ASSIGNMENT OF ERROR NUMBER 4

In this assignment, the defendant argues that his counsel’s performance was constitutionally deficient for failing to insure the appropriate jury instruction on possible penalties was given. The defendant maintains that because the jury could not return a verdict for aggravated rape without instruction on the penalty for that offense, counsel provided ineffective assistance by not objecting to the trial court’s refusal to so instruct the jury. However, the defendant was never charged with, prosecuted on, or sentenced for aggravated rape, and thus, this argument is completely immaterial. Ford was charged with attempted aggravated rape, and, as noted above, in such cases the court is not required to charge the jury on penalties.
This assignment has no merit.
| uFor the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. The defendant's first name is incorrectly spelled Jeffrey in some of this Court’s documents.

. The State offered a red shirt as an exhibit; however, the police report described a black shirt, and at trial a black shirt was shown to the defendant’s mother who said it did not belong to her son.

. These quotes are from Justice Dennis's dissent to the original Opinion in which the majority affirmed the conviction for attempted aggravated rape; after a rehearing, however; Justice Dennis wrote the majority opinion which found that attempted forcible rape was the proper verdict.