11 JOAN BERNARD ARMSTRONG, Chief Judge.

STATEMENT OF CASE

On April 25, 2002, the defendant, Jeffro Williams, was indicted for first degree murder during an armed robbery.[1] On May 1, 2002, he pleaded not guilty. On August 1, 2002, a hearing on the motions was held, and the trial court denied the motion to suppress the evidence and the identification. On August 15, 2002, the hearing was concluded, and the court denied the motion to suppress the statement. On September 22, 2003, the date that trial had been set, the defendant filed a motion to exclude the results of DNA testing and a motion to quash. On January 7, 2004, the trial court denied the motions. On February 9, 2004, the bill of information was amended to charge the defendant with second degree murder, and trial began with jury selection. On February 10-12, 2004, the trial was held. The jury then found the defendant guilty of second degree murder, a violation of La. R.S. 14:30.1. On March 26, 2004, the trial court denied the motion for a new trial and motion in arrest of judgment[2] and imposed a sentence of life [ imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The court also denied the motion to reconsider sentence. The defendant now appeals raising one assignment of error.[3]

STATEMENT OF FACT

At trial Terry Travis Peters testified that on February 5, 2002, she was on her way home from work when her cousin called and told her that her father, Leonard Travis, who had worked at Sewell *1173 Cadillac for fifty years, had been shot at his house. She went home and then to her father’s house. She found her father lying on the ground. A detective asked her to identify him at the scene. Her father drove a F-150 navy-blue Ford truck, which he had purchased in November 2000. She identified his glasses, which were introduced into evidence.
Stephanie Brisco, a senior dispatcher with NOPD, identified the 9-1-1 tape, which was played. Officer Latina Jolivette testified that on February 5, 2002, she was assigned to investigate the scene at 2500 Palmyra Street. When she arrived, she observed a black male lying face down in a pool of blood. Officer Jolivette said that the victim had been shot once in the face. She called for an EMS unit, but the fire department arrived first. The firemen turned the victim over to administer aid. The officer stated that she talked to a neighbor and found out that the victim, Leonard Travis, owned a blue truck, but it was not at the scene; only a club was on the ground. On cross-examination Officer Jolivette testified that the dispatcher sent the crime lab out to retrieve the club. She did not recall if there was blood on the club.
| sDr. Richard Tracy, a pathologist, testified that he performed the autopsy on Leonard Travis. He stated that the bullet entered the left side of the victim’s face, passed through the structures of the mouth and upper neck, shattered the jaw bone, and stopped beneath the skin on the back of the neck. He recovered the bullet and identified it in court. Dr. Tracy explained that the bullet passed through the carotid artery, and the victim suffocated on the large amount of blood that spilled into the airway. The time of death was 6:36 p.m., according to the autopsy report. On cross-examination the doctor stated that Leonard Travis was five feet, eight inches tall and indicated that the track of the bullet was a slight downward path.
Det. Dennis Green of the Mobile, Alabama Police Department, testified that on February 3.5, 2002, he investigated an abandoned vehicle, which was a 2001 dark blue Ford pick-up truck, located at the Village Lodge. The detective ran the license plate, and it appeared to be stolen; however, the plate went to another vehicle. According to the VIN number on the truck, the truck was also stolen. There was an alert from New Orleans indicating a carjacking and possible homicide. He opened the doors just to visually scan the vehicle. He spotted dried blood that had dripped down into the map pocket on the door. The truck was towed away for processing without anything being touched. New Orleans was contacted.
Det. Eduardo Colmenero, the NOPD homicide detective, testified that he did not go out to the scene of the crime on February 5, 2002. Dets. Eskine and Anderson investigated the scene, and he remained on a parade route. It was a cold, rainy, windy day. He stated that he was informed that the victim was lying on the ground, and his vehicle was missing. The truck was located on February 15, 2002 in Mobile, Aabama. Det. Colmenero said that he and Det. Prochaska traveled to LMobile, spoke with the officer involved there, went to see the truck, and took photographs. He reviewed the records at the Village Lodge for a list of individuals who stayed there around the time that the truck was abandoned. The vehicle was towed to New Orleans. He and a technician examined the interior and collected several items from the truck. They recovered burned cigarette butts, a piece of paper with blood, an empty cardboard box, a Starburst candy wrapper, a piece of paper with a phone number, two matches, a cap, and a bag of napkins. He also found *1174 a screwdriver, a newspaper, an umbrella, a small brown bag, a black flashlight, a dirty-white towel, a telephone cord, a pink sheet, a Bally’s match box, and a latex glove. An employee parking tag for Sewell Cadillac was found on the rearview mirror. The license plate and screws were taken from the back of the truck, but the license plate number did not match the truck. The detective sent the cigarette butts, the piece of paper with blood, and the knit cap off for testing. He subpoenaed the Verizon records relating to the phone number on the paper and developed the investigation. The person with the phone number (913— 1453) was Jeffrey Bonck, who lived at 7001 Bundy Road, Apt. Z-36, New Orleans.
Det. Colmenero stated that he and Det. Eskine contacted Bonck at his residence on February 22, 2002. The detectives asked Bonck to go back to police 'headquarters with them. Det. Eskine located a handgun, which was confiscated. When the officers questioned him about the homicide and the truck, Bonck asked if it was a blue truck. According to the detective, Bonck then said: “Ro and Jeffro were involved.” Bonck gave the detectives a statement, which was audio and videotaped. He provided cell phone numbers for Kimbrough and Williams. The detectives discovered the names to whom the phones were registered and subpoenaed those records, which showed calls between Bonck and a cell phone |Bassociated with Kimbrough and a residential phone line associated with the defendant. Another phone was registered to Anthony Archie, whose billing address was located in Mobile, Alabama. According to Det. Col-menero, Bonck identified Williams as the driver of the blue truck, and Kimbrough as the passenger in the truck. The detectives obtained arrest warrants for Kimbrough and Williams, who were arrested on February 23, 2002. They obtained search warrants for the residences of both suspects and retrieved a number of items. In the defendants residence they found a Ford key ring with one key. A cell phone was taken from Kimbrough. According to Mr. Travis’ time sheet at Sewell Cadillac obtained by the detectives, he clocked out at 5:54 p.m. on February 5, 2002. Det. Colmenero stated that he went to Mobile and met Anthony Archie, who gave a taped statement. Archie picked the defendant out of a photo lineup and confirmed Kim-brough’s phone number. Archie identified Travis’ truck from crime lab photos.
On cross-examination Det. Colmenero testified that he ran Bonck’s criminal record and found that he had a conviction for possession of cocaine and arrests for auto theft and possession of marijuana. The detective said that the 9 mm gun was found on Bonck’s sofa or between the cushions of the sofa. When questioned as to why Bonck’s other cell phone number had not been investigated, Det. Colmenero said that Bonck had indicated that the cell phone belonged to his girlfriend. The officer conceded that he knew that Bonck was a convicted felon out on probation and that possession of a weapon was a violation of his probation. Det. Colmenero stated that the articles taken from the defendant’s residence failed to show the presence of blood. He admitted that he did not charge Bonck with a violation of La. R.S. 14:95.1 and did not call his probation officer.
|fiOn redirect Det. Colmenero stated that he did not further investigate the one cell phone number noted by defense counsel because Bonck had provided the information about the two perpetrators, and further investigation was not necessary. He testified that a 9 mm gun was not the weapon used in the homicide. The bullet retrieved during the autopsy indicated a .380 caliber weapon. He explained that he had contacted the federal agents about Bonck because of Project Exile, whereby officers were to so notify the federal *1175 agents about La. R.S. 14:95.1 charges. He declared that he did not promise Bonck anything for his cooperation.
Amrita Lai, the laboratory manager at the private DNA laboratory, ReliaGene, testified that the defendant’s DNA matched that found in the cigarette butts from the truck.
Jeffrey Bonck testified that he had two prior convictions; one involved possession of cocaine and the other related to a possession with intent to distribute heroin. He was convicted on the cocaine charge in 2002 before February 5, 2002. The heroin conviction occurred in September 2002. He said that he and Kimbrough, nicknamed Ro, were from the same neighborhood. He knew Ro for many years. He also said that he knew the defendant from the same neighborhood. Bonck testified that his car was stolen in February 2002, and a couple of days later, Kimbrough and Williams stopped by his home after Ro called him on his cell phone. Ro asked if Bonck knew anyone who wanted to buy a 2001 Ford F-150 truck, and Bonck told him to stop by with the truck. When the two arrived, Bonck said he saw a dark blue F-150 four-door truck with the defendant driving. The interior was leather and the truck was loaded. Bonck said that he saw the Cadillac parking permit and blood on the armrest. He identified the photo of Travis’ truck. Bonck told the two to hold onto the truck, and he would see if he could find a 17buyer. Bonck testified that he asked how the two had obtained the vehicle. The defendant “said that they had knocked somebody out in the 4th ward and they took the truck.” The defendant “said that he did mostly all the work, that Ro was scary.” He could not recall the defendant’s clothing, but thought that it was dark. He remembered that Ro was wearing a burgundy sweatshirt with a gray cap, a gift from him. He identified the gray cap. Bonck claimed that he did not intend to become involved once he saw the blood on the armrest. He said that he avoided calls from both the defendant and Ro, but he had already written his cell phone number down on a piece of paper. Bonck admitted that the police officers found a gun. on his sofa when they entered his residence. He stated that the officers did not make promises or force him to cooperate. He said that no one forced him to make the identification.
On cross-examination defense counsel asked Bonck if he dealt in stolen cars and did VIN jobs. He denied buying and selling stolen cars, but admitted that he knew people in the business. He admitted that he pleaded guilty to possession of cocaine in January 2002 and was on probation for three years when the officers knocked at his door in February 2002. He admitted that he thought that he was in trouble for having the gun when the officers said that they wanted him to go down to the station. He conceded that he was read his rights and was under some kind of detention dr arrest. He admitted that he knew he was in trouble. He first learned about the homicide at the police station when the officers showed him a photo of the truck. He had heard rumors about it. Bonck said that Ro had called him before, but not the defendant. He stated that he provided the officers with the name of Leonard Travis from the Cadillac parking tag. He admitted that no bill of information was filed relating to the gun and no rule to revoke his probation was |sfiled. He admitted that he pleaded guilty to possession with intent to distribute heroin in Jefferson Parish; he said that the additional charge under La. R.S. 14:95.1 was dropped even though there had been a gun in the motel room where he was arrested because it belonged to the other suspect. Counsel focused on questions about the multiple bill that the State did not file, and the breaks that Bonck was given. On redirect *1176 Bonck stated that he took responsibility for the crimes and pleaded guilty.
Anthony Archie, who resided in Mobile, Alabama, testified that in February 2002 he was in New Orleans for Mardi Gras. He met the defendant through a cousin, and they exchanged cell phone numbers. After he went home to Alabama, the defendant called and said that he was heading to Alabama. The defendant asked whether the police in Mobile were crooked and whether there were a lot of police officers. Archie told the defendant that the police in Mobile were cool. When the defendant arrived in Mobile, he called Archie, and they met at an Amoco station, which was not far from the Villager Lodge. Archie stated that the defendant was driving a blue Ford truck, which he identified from the photos of the victim’s truck. He said that the defendant stayed a day or two in Mobile, and he always drove his car. After the defendant left, he called Archie. Archie said that at some point the police contacted him, and he gave a statement. He stated that he picked the defendant out of a photo lineup.
On cross-examination Archie said that he did not know the date he arrived in New Orleans; it was the weekend before Mardi Gras. He visited a friend at Xavier University and then his cousin, who introduced him to the defendant. He admitted that he drove the defendant every time in New Orleans, and he never saw him in | phis own vehicle, and not a blue truck. He admitted that the defendant never told him that the truck was stolen and that it was involved in a murder.

ERRORS PATENT

A review of the record reveals an error patent. On March 26, 2004, the trial court denied the defense motion for a new trial and the motion in arrest of judgment, and then it sentenced the defendant. The court did not wait twenty-four hours as required by La.C.Cr.P. art. 873, and the transcript does not indicate that the defendant waived his right to the delay.
La.C.Cr.P. art. 873 provides in pertinent part: “If a motion for a'new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.” See also State v. Ashford, 2003-1691 (La.App. 4 Cir. 6/16/04), 878 So.2d 798.
In State v. Gibson, 2003-0647, p. 6 (La. App. 4 Cir. 2/4/04), 867 So.2d 793, 797, this Court discussed art. 873 and the relevant jurisprudence:
In State v. Collins, 584 So.2d 356 (La.App. 4th Cir.1991), this Court discussed the Augustine case as follows:
In State v. Augustine, 555 So.2d 1331 (La.1990), the Supreme Court held that the trial court’s failure to observe the twenty-four hour delay did not constitute harmless error, even if the defendant did not raise that issue as error on appeal, where the defendant challenged his sentence on appeal. In the present case, defendant does not challenge his sentence and he does not raise as error the failure of the trial court to wait twenty-four hours before imposing sentence. Therefore, this error is harmless.
In State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, the Louisiana Supreme Court distinguished that case because of the mandatory nature of the |1fldeath sentence in the first degree murder case, and the fact that no prejudice could be shown for the failure to wait twenty-four hours before sentencing. The Court held: “Absent a showing -that prejudice resulted from the failure to afford the statutory delay, reversal of the prematurely imposed sentence is not required.” Id., at p. 17, *1177 684 So.2d at 380. Where the sentence to be imposed is mandatory and not within the trial court’s discretion, this Court has held that the failure to observe the delays in sentencing is harmless error. State v. Davis, 2002-2061, p. 14 (La.App. 4 Cir. 10/8/03), 859 So.2d 776, 784; State v. Allen, 94-1895 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078, 1083. If the defendant has not challenged his sentence, and he does not raise as appellate error the failure of the trial court to wait twenty-four hours before imposing sentence, the error is harmless. State v. Williams, 2003-0987, p. 5 (La.App. 4 Cir. 12/10/03), 863 So.2d 652, 655, writ denied, 2004-0261 (La.6/4/04), 876 So.2d 75.
Here the defendant did not challenge his sentence on appeal and did not raise as error the trial court’s failure to wait twenty-four hours before sentencing him. Additionally, the sentence for second degree murder is mandatory and not within the court’s discretion. Therefore, the error is harmless.

ASSIGNMENT OF ERROR NUMBER 1

In his sole assignment of error, the defendant argues that his conviction is not supported by a valid verdict because one of the ten jurors who voted guilty unambiguously revealed during polling that her guilty verdict reflected her intent to find the defendant guilty of attempted murder, not second degree murder. He argues that when the trial court discovered that only nine jurors voted to find the defendant guilty of second degree murder, it should have sent the jury back for further deliberations or granted the defendant a new trial. The State counters that InMs. Holmes clearly indicated to the trial court that she intended to find the defendant guilty as charged and had written guilty at first, before scratching it out to write ‘Tes”. The State argues that the trial court believed that Ms. Holmes’ error in saying attempted murder was due to stress and pressure.
According to the trial transcript, the jury returned with a verdict of guilty as charged; the vote was ten to two. Apparently, there was a request that the jurors be polled, and the court utilized written polling. The record contains copies of the written slips of the twelve jurors. The slips asked: “Is this your verdict?” Ten jurors answered: “Yes”. Two of those ten slips signed by Tuesday Holmes and Anita Jackson contained scratch-outs. The courtroom was cleared, and the trial court explained that there would be an inquiry in chambers as to the verdicts of jurors. Defense counsel expressed concern that a juror had gone to a great deal of trouble to blank something out. In scratching out what she had written first, Ms. Holmes had blackened the word so that it could not be seen. The defendant was removed from the judge’s chambers as Ms. Holmes entered. Defense counsel objected.
When asked by the court if that was her verdict, Ms. Holmes said: “Uh-huh.” When asked for' her verdict, she said: “Guilty. That’s what I wrote there and I scratched it out and put yes.” The court then asked: “So the first word you scratched out was? She answered: “Was guilty.” The trial court asked: “Guilty of what?” Ms. Holmes answered: “Attempted murder.” The court then showed the juror the verdict sheet,[4] and Ms. Holmes stated that her verdict was guilty as charged. She explained that she thought that the jurors were to write guilty or not 1; .¡guilty; therefore, she wrote guilty. Then she realized that she was to answer yes or no; therefore, she scratched out guilty and wrote yes. Ms. Holmes apparently had become upset. The trial court said to wait a minute, and defense counsel *1178 noted that he had to ask the questions and inquired if she needed water or something else. She shook her head negatively, and the State noted that this did not seem proper. At that point the record indicates that Ms. Holmes started to cry. Defense counsel then asked: “You said, [guilty of attempted murder;’ is that the word? When the judge asked you, guilty of what, you said guilty of attempted murder?” Ms. Holmes answered: “Right. That’s what he was charged with.” Defense counsel noted that perhaps they should not go further, and the court told Ms. Holmes that she could go.
Anita Jackson then entered. The court asked what she had written in answer to the question of whether that was her verdict. Jackson answered: “I put guilty at first, then I put yes. I hadn’t read the question thoroughly enough. So it was yes, this is my verdict.”. The trial, court asked: “Guilty of?” Jackson answered: “Guilty of murder in the second degree.” Jackson then exited.
Defense counsel explained that he had no further questions for Ms. Holmes because the questions were leading her one way or another. Counsel noted that the court’s open-ended question resulted in Jackson stating that the defendant was guilty of attempted murder, but when the court showed her the verdict sheet, she pointed to the top. Counsel said that when he asked why she had indicated attempted murder, she answered: “That’s what he was charged with.” Counsel argued: “Demonstrating an absolute complete misunderstanding of the nature of the proceedings that we have been going through for the last four .days. And even |isat this date, a lackof [sic] knowledge of what guilty as charged meant. She thought guilty as charged meant attempted murder.”
The trial court noted for the record that Jackson had first been called to the court’s attention when she was concerned that she heard a news broadcast overnight and was afraid that she might be acquainted with a relative of codefendant Kimbrough. The trial court stated that it found that the news broadcast did not taint or compromise Jackson’s ability to serve as a juror. The court further stated:
The Court also wants to have it noted that the juror, Ms. Holmes, obviously felt a great deal of pressure having been summoned in a post verdict context to chambers, having been singled out from the jury at large. Having sat down in chambers, surrounded by lawyers and a court reporter and be subject to inquiry regarding the content and the condition of her verdict sheet. Before she left the Judge’s chambers, after the few questions directed toward her, she actually had begun to break down and began sobbing.
The Court simply thinks it’s important to note the obvious emotional stress and turmoil that this particular juror felt. And it should be a matter of record that those are the circumstances under which she gave whatever responses she gave to the inquiries directed to her.
Defense counsel then moved for a mistrial because the irregularity in the polling procedure demonstrated a fundamental flaw within the process. Counsel noted that Ms. Holmes, who was one of the ten guilty votes, thought she was ‘finding the defendant guilty of attempted murder by her own words. The State countered that when the trial court showed Ms. Holmes the verdict sheet, she indicated the verdict of guilty as charged to second degree murder by pointing to the guilty as charged verdict.
La.C.Cr.P. art. 812 provides:
The court shall order the clerk to poll the jury if requested by the state or the defendant. It shall be within the discre *1179 tion of the court whether |14such poll shall be conducted orally or in writing by applying the procedures of Paragraph (1) or Paragraph (2) of this Article.
(1) Oral polling of the jury shall consist of the clerk’s calling each juror, one at a time, by name. He shall announce to each juror the verdict returned, and ask him, “Is this your verdict?” Upon receiving the juror’s answer to the question, the clerk shall record the answer.
If, upon polling all of the jurors, the number of jurors required by law to find a verdict answer “Yes,” the court shall order the clerk to record the verdict and the jury shall be discharged. If, upon polling all of the jurors, the number required to find a verdict do not answer ‘Yes,” the jury may be remanded for further deliberation, or the court may declare a mistrial in accordance with Article 775.
(2) The procedure for the written polling of the jury shall require that the clerk hand to each juror a separate piece of paper containing the name of the juror and the words “Is this your verdict?” Each juror shall write on the slip of paper the words ‘Yes” or “No” along with his signature. The clerk shall collect the slips of paper, make them available for inspection by the court and counsel, and record the results. If a sufficient number of jurors as required by law to reach a verdict answer “yes” the clerk shall so inform the court. Upon verification of the results, the court shall order the clerk to record the verdict and order the jury discharged. If an insufficient number required to find a verdict answer ‘Yes,” the court may remand the jury for further deliberation, or the court may declare a mistrial in accordance with Article 775.
In State v. Haynes, 99-1973, pp. 12-13 (La.App. 1 Cir. 6/23/00), 762 So.2d 1247, 1254-55, when the jurors were initially polled, three members of the jury responded “no” when asked if the verdict to convict was their verdict. The court ■ noted the verdict was incorrect and asked, that the jury be re-polled; a proper verdict (10-2) was then returned. The First Circuit stated:
The defendant now apparently contends that the trial court had no discretion to repoll but could only declare a mistrial. However, the defendant made no contemporaneous objection at trial to the polling procedure used by the trial court. La.Code Crim. P. art. 841. See also State v. Amato, 96-0606 (La.App. 1 Cir. 6/30/97), 698 So.2d 972; units denied, 97-2626 and 97-2644 (La.2/20/98), 709 So.2d 772. The trial court’s actions were not coercive but merely an attempt to clarify the return of an improper verdict upon the jury’s signal that a proper verdict had been reached. The record does not support the defendant’s 11ficlaim that the juror had changed her vote from “guilty” to “not guilty.” Rather, it appears the juror was correcting an error. While it would have been a better practice, upon counting three “no” votes, to remand the jury for more deliberation or to determine on the record whether the initial polling was erroneous or if further deliberations were needed, a mistrial is required only where the jury is unable to reach a verdict by the proper concurrence.

Id.

In State v. James, 99-1858, pp. 5-6 (La.App. 3 Cir. 5/3/00), 761 So.2d 125, 129-31, the defendant argued that the trial court erred in interrogating a juror regarding her “no” vote during the written polling of the jury, in violation of La.C.Cr.P. art. 812. The State responded that defense counsel failed to make, a contemporaneous objection to the trial court’s polling procedure *1180 and, alternatively, that any error was harmless. The Third Circuit noted that at the close of deliberations, the six-person jury presented its verdict forms for each charge. The trial court then ordered that the jury be polled in writing. On the charge of unauthorized entry of an inhabited dwelling, the written poll revealed a unanimous vote for conviction. On the charge of second degree battery, however, Juror Braden indicated on her polling card that she did not vote to convict. Under La.C.Cr.P. art 782(A), the concurrence of all six jurors was required to render a verdict on that charge. The trial court then questioned Juror Braden about the “no” answer to the question of whether he concurred in the guilty verdict as to the second degree battery charge. The court asked whether the juror voted no, and Braden explained that the jurors talked about the charge and she felt that there was no proof that the defendant actually did it, but she felt “outvoted” and agreed to vote “yes”. When asked if she voted “yes” by the end of her deliberations, she answered affirmatively. She agreed that in preliminary discussions she voted “no”, but by the end she voted “yes”. The Third Circuit noted that the trial court had not 1complied with the codal article because it questioned one juror rather than remanding the entire panel for further deliberation or declaring a mistrial. The court discussed relevant jurisprudence:
In [State v.] Bannister, 726 So.2d at 1141 [97-48, p. 11 (La.App. 4 Cir. 1/27/99); 726 So.2d 1135, 1142], the trial court determined that the results of a written poll did not reflect a legal verdict, at which time a juror blurted out, “I have the tally right here ... you all have to vote the same way — you all voted upstairs.” The trial court stopped that juror, repeated its instructions, and polled the entire panel again. After two bench conferences, the trial court polled the jury a third time before it pronounced a legal verdict. The appellate court noted the error of not returning the panel for deliberation, but found it harmless, as the record did not indicate that the comments of the juror influenced any of the others to change their votes. In State v. Amato, 96-606 (La.App. 1 Cir. 6/30/97); 698 So.2d 972, writ denied, 97-2626 (La.2/20/98); 709 So.2d 772, one juror wrote “no” on a written ballot, but after questioning from the trial court stated that he probably misunderstood the written form and that he meant to respond “yes.” Additionally, the jury foreman stated that the vote was unanimous at the time the verdict was reached. The appellate court found no error where “the record show[ed] beyond a reasonable doubt that the verdict on Count 1 was unanimous.” Id. at 688 — 89[988—89].
Id. at pp. 8-9, 761 So.2d at 130-31. The Third Circuit noted that Juror Braden readily admitted that she voted to convict during deliberations. Although she may have initially expressed some doubt, she changed her mind and voted with the majority. The record did not reveal that she was pressured into changing her vote, other than she was “out voted.” The Third Circuit concluded: “Although proper procedure would have been to remand for further deliberation, we do not find that noncompliance with' Article 812 was reversible error in this case. By questioning Juror Braden, the trial court did determine that all six jurors voted to convict Defendant of second degree battery.” Id. at p. 9, 761 So.2d at 131.
In State v. McClain, 04-98, p. 15 (La.App. 5 Cir. 6/29/04), 877 So.2d 1135, 1144, the defendant contended that the juror, Mr. Simmons, was singled out and questioned at the bench about his verdict because he wrote “no” on his polling slip. |17He argued that Mr. Simmons was intimidated by the questioning and was unduly *1181 influenced to agree to a guilty verdict. Therefore, the verdict was tainted with uncertainty. The State maintained that the defendant waived any error when he did not object to Mr. Simmons being called to the bench and when he participated in questioning Mr. Simmons about his verdict. The Fifth Circuit determined that defendant’s motion for a mistrial immediately after Mr. Simmons was questioned sufficiently preserved his right to appeal the issue. After Mr. Simmons wrote “no” on his polling slip, the trial court called him up to the bench and “[i]n the presence of the prosecutor and defense counsel, the trial judge asked Mr. Simmons if he understood the question of whether or not this was his verdict. Mr. Simmons responded, “I ain’t never did this before.” The trial judge explained to Mr. Simmons that the question is whether the verdict that the jury rendered and that was read to the Court was his verdict ...,” whether he agreed with the verdict, but “there was no audible response.” Id. at p. IS, 877 So.2d at 1145. The court then questioned Mr. Simmons about his verdict, and he indicated that he agreed with the verdict of the jury and stated: “I was just confused. I ain’t never been in this situation and the whole situation got me just totally confused.” Id. at p. 16. He indicated that his personal vote was guilty of indecent behavior with a juvenile, and he agreed with the guilty verdict of the jury. Id. The Fifth Circuit concluded:
The trial judge did not technically follow instructions set forth in LSA-C.Cr.P. art. 812(2) when he questioned the juror as opposed to remanding the jury for further deliberation or declaring a mistrial. However, we find the error to be harmless. In a similar case, State v. James, supra, defendant claimed the trial court erred in interrogating a juror regarding her “no” vote during the written polling of the jury in violation of LSA-C.Cr.P. art. 812. In James, the trial court called the juror to the bench and questioned her about her verdict. The juror revealed that she had initially felt the defendant was not guilty but felt outvoted and eventually voted that he was guilty. The Third Circuit concluded that, although the trial court did not comply with LSArjC.Cr.P.18 art. 812 when it failed to remand the entire jury panel for further deliberations or declare a mistrial, the error was harmless. The court noted the juror readily admitted. she voted to convict during deliberations. The court further noted the record did not reveal she was pressured to change her vote during deliberations but simply changed her mind and voted with the majority. The court determined that by questioning the juror, the trial court determined that all six jurors voted to convict the defendant. Also, in State v. Amato, 96-606 (La.App. 1 Cir. 6/30/97), 698 So.2d 972, 988-989, writs denied, 97-2626 and 97-2644 (La.2/20/98), 709 So.2d 772, the First Circuit found the trial court’s questioning of a juror who had written “no” on the written polling slip to be harmless error. In Amato, the juror wrote “no” on his polling slip when asked whether the verdict was his verdict. Thereafter, the trial court orally polled the jury at which time the juror responded “yes.” The trial court further questioned the juror who admitted he was confused. The First Circuit found any error in the interrogation of the juror by the trial court was harmless because the record showed beyond a reasonable doubt that the verdict was unanimous.
In the present case, Mr. Simmons clearly stated he believed defendant was guilty. The record, as well as the personal observations of the trial judge, reflects Mr. Simmons was simply confused by the polling process. The questioning of Mr. Simmons was not sugges *1182 tive or intimidating but was rather a harmless attempt to clarify the verdict. Mr. Simmons stated he was confused by the process and firmly stated he believed defendant was guilty. Therefore, we find that the failure to comply with La.C.Cr.P. art. 812 in this case is harmless error.
Id. at pp. 18-19, 877 So.2d at 1146-47.
In the present case, the verdict form indicated that the jury found the defendant guilty as charged of second degree murder. According to the written polling slips, ten of the twelve jurors answered “yes” to the question: “Is this your verdict?” Under La.C.Cr.P. art. 812- there were a sufficient number of “yes” answers; there were ten out of twelve. See La. Const. Art. I, § 17. Therefore, the verdict could have been properly recorded. Unlike Haynes, James, and McClain, here there were ten polling slips with the answer “yes”; there was no slip with a “no” answer to prompt the inquiry and questioning of the juror as to his/her intent in writing “no”. Defense counsel and the trial court focused on the scratch-outs on 113two of the “yes” polling slips; the inquiry went beyond that required by the article. Nonetheless,, as noted by the circuit opinions discussed, Ms. Holmes, like the jurors who had answered “no” in the other opinions, was somewhat confused and satisfactorily explained why she had first written guilty, and then changed her answer to “yes”, as required by the question. The trial court was not persuaded by the fact that she erroneously said that the crime was attempted second degree murder during questioning in the judge’s chambers when she began to cry. The trial court put on the record that the juror had become emotionally upset during the inquiry; such an error was possible under those stressful conditions. Ms. Holmes had written “yes” as her answer before she turned in the polling slip. That answer, along with the other nine similar answers, was sufficient to convict the defendant of second degree murder.[5]
The trial court properly did not remand the jury for further deliberations when there were ten “yes” answers to the polling slips and properly did not grant the defendant a mew trial. This assignment lacks merit.
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Codefendant Robert Kimbrough was also charged with first degree murder during an armed robbery, and the bill of information was amended on April 28, 2004 to charge accessory after the fact to second degree murder. By the hearings on the motions, it was known that the defendants would be severed for trial. Actually, Kimbrough pleaded guilty and was sentenced to five years at hard labor.

. The March 26, 2004 minute entry notes first that the trial court sentenced the defendant before noting that the court denied the motions. According to La.C.Cr.P. arts. 854 and 861, the defendant's motions for a new trial and in arrest of judgment must be disposed of before sentencing. However, the March 26, 2004 transcript indicates that the court first denied the motions and then sentenced the defendant.

.In September 2004, the defendant filed a pro se motion to file a supplemental brief. On September 27, 2004, this Court forwarded a copy of the appellate record to the defendant and granted his motion to file a supplemental brief. He was granted forty-five (45) days from the issuance of the order in which to file the supplemental brief. However, the defendant has not filed a supplemental brief as of this date.

. The verdict sheet listed: "Guilty as charged; guilty of manslaughter; and not guilty.”

. The State also argues that the victim died; therefore, Ms. Holmes would not have found the defendant guilty of attempted second degree murder.