842 So.2d 1153 (2003)
STATE of Louisiana
v.
Frank SMITH.
No. 2002-KA-2340.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 2003.
*1154 Laura Pavy, Louisiana Appellate Project, New Orleans, LA, For Defendant/Appellant.
(Court composed of Judge CHARLES R. JONES, Judge JAMES F. MCKAY, III, and Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS JR., Judge.
On 28 June 2001, Frank Smith ("Smith") was charged by indictment with (a) two counts of aggravated rape, a violation of La. R.S. 14:42, (b) one count of aggravated oral sexual battery, a violation of La. R.S. 14:43.4, and (c) one count of armed robbery, a violation of La. R.S. 14:64.[1] He entered a plea of not guilty at his arraignment on 10 July 2001. In a series of hearings, the court granted the state's motion to introduce DNA evidence and the defense's motion to have its expert examine the DNA evidence submitted by the state. After a two-day trial on 11 and 12 June 2002, a twelve-member jury found Smith guilty of two counts of attempted aggravated rape, one count of aggravated oral sexual battery, and one count of armed robbery. Smith was sentenced on 12 August 2002 to serve fifty years at hard labor without benefit of parole, probation, or suspension of sentence on each of the two counts of attempted aggravated rape, twenty years at hard labor without benefit of parole, probation, or suspension of sentence on the aggravated oral sexual battery, and ninety-nine years at hard labor without benefit of parole probation, or suspension of sentence on the armed robbery conviction. All the sentences are to run concurrently. The defense attorney objected to the sentence as excessive and filed a motion for reconsideration of sentence, which the court denied. Smith's motion for an appeal was granted.

STATEMENT OF FACTS
At trial, S.C.,[2] the twenty-eight year old victim, testified that she is now employed as an aeronautical engineer with Lockheed Martin; at the time of the incident at issue here, she was studying for her master's degree in engineering management. On 9 May 2001, while living in the 300 block of South Murat Street in New Orleans, she had a satellite dish installed at her house. The person installing the dish left between five and six o'clock in the evening. The victim went to a poetry reading with a friend that night, departing her home between seven and eight o'clock and returning shortly after eleven o'clock. She went to bed immediately. Her small dog was on her bed. She was awakened some hours later by the sound of her dog walking across the floor, and she saw a shadow in the doorway of her bedroom. By the time she was fully awake, she realized a male was standing near her bed. The man said "to be quiet and not make any noise because he had a knife and he told me to *1155 get up and turn on the light." When she turned on the light, the victim saw a naked young man holding a knife from her kitchen. She pleaded with him, but he warned her to be quiet. He tried to get on top of her but she told him she was having her period. He told her to take out the tampon; she did so and he then raped her vaginally. He next told her to give him oral sex. She resisted and he jumped at her with the knife. She complied, and after a few minutes, he told her to stop because he wanted to rape her anally. Again she pleaded with him not to do it. She had Vaseline on her dresser that she used on her feet at night, and he used that prior to the anal rape. She said that she kept watching him to see if he would let go of the knife because he was not very big, and she thought she might be able to get away from him, but he kept the knife in his hand. She noticed the man had a scar over his left eye. He next raped her vaginally again. He ejaculated on the sheets of her bed.
He told her "he felt like he had a hostage" and he was going to remain there for a while. She told him she was expected at work very early and that people would come looking for her if she were late. He immediately got up, dressed, and asked her for money. She had only five dollars, which she gave him. He also took her driver's license. He dressed in plaid boxer shorts and a dirty T-shirt. Before he left, he took the sheets off her bed and began wiping the doorknobs and other items he had touched. She estimated that the entire ordeal took about an hour and a half to two hours. As he was readying to leave, he turned to her and said that he probably should not leave because she "might say something." She assured him she was too frightened to tell anyone. He threw the knife on the sofa and left taking the sheets from the bed, her driver's license, and the five dollars.
The victim locked the door and called her parents. Her mother instructed her to call 911, but she was frightened that the rapist might still be outside. Her mother then suggested that she call a neighbor, which she did. The neighbor came to her residence and called the police. S.C. spoke to the 911 operator; she described a young man, shorter than five feet, eight inches tall, with a scar over his left eye. After the police arrived, she noticed that there was a ladder against her back door, and the window vent above the door was open. S.C. was taken to Charity Hospital for a rape examination. When she returned to her house, she found the man who had installed the satellite dish had returned for his ladder; she told him the police had it because someone had used it to break into her house. S.C. then went to her parents' house in Slidell.
The following Saturday, 12 May 2001, S.C., several family members, and friends returned to her residence in order to move her belongings. S.C. began crying when she entered her bedroom, and her mother told her to go outside. She was standing outside with one of her neighbors when she saw the man who raped her. She pointed to the man and screamed to her brother "[t]hat's him." Her brother, her parents, an uncle, and cousins ran toward him. She identified him, Smith, both at that time and again in court.
Creighton Attaway of the 300 block of South Murat Street testified that he received a telephone call from the victim's mother in the early hours of 10 May 2001. He went to S. C.'s house where he found her "curled up in a fetal position ... crying hysterically." Mr. Attaway called 911. He told the court that he had seen Smith hanging around the neighborhood prior to 10 May 2001. Mr. Attaway said that in spite of the fact that his home shared walls *1156 with S.C.'s home, he did not hear anything that night.
Kate Palisi, a forensic nurse expert at Charity Hospital, testified that she examined S.C. at about four o'clock in the morning on 10 May 2001. Ms. Palisi learned from the victim that she had been penetrated vaginally, anally, and orally. S.C. also told her that the assailant held a knife during the attack. In her examination of the victim, Ms. Palisi found a one-quarter-inch tear in the vagina and an eight-inch rectal tear. Ms. Palisi completed a "rape kit," so that a chemist could examine the oral, vaginal, and rectal swabs for detection of seminal fluid.
Denise Mire, a chemist from the Orleans Parish Coroner's Office, testified that she tested the swabs. She found that the vaginal and rectal swabs were positive for seminal fluid, and the oral swabs were negative. Of the interior and exterior vaginal and rectal swabs, both the vaginal and rectal external swabs tested positive for seminal fluid, and both the internal vaginal and rectal swabs tested negative. The samples were then released to Richard LeBlanc of the Orleans Parish District Attorney's Office, who transported them to ReliaGene Technologies where DNA testing was done.
Ms. Amrita Lal, an expert in forensic DNA analysis, testified that she manages the laboratory at ReliaGene Technologies that conducted the DNA testing of the body fluids submitted from Smith and the victim. The DNA tests indicated that Smith's DNA was consistent with the fluid found on the rectal swab from S.C. The DNA results from the vaginal swab excluded Smith as a donor.
Sergeant Steven Villere and Detective Henry Waller both investigated the incident. Sergeant Villere arrived shortly after one o'clock in the morning of the crime and spoke to Mr. Attaway and the victim. Detective Waller got a description of the attacker from the victim and later that week searched Smith's house where he found boxer shorts similar to those described by the victim.
W.C., the victim's brother, testified that he was at his parents' house in Slidell on 10 May 2001 when his sister telephoned them. His parents left immediately, but he stayed there because a young cousin was sleeping over. On 12 May 2001, while he was helping his sister move, both of them were outside the house; he noticed she was crying, and she said, "That's him." At that moment Smith was standing across the street. W.C. ran over to him and asked if he knew S.C., and Smith answered that he did not. Smith began backing away from W.C., and when he turned to run, several other men in S.C.'s family were coming toward him. Smith turned and ran toward W.C. who immediately caught him. The police were called, and Smith was arrested. The victim's father and uncle testified to the same facts concerning the apprehension of Smith.
Officer Jason Giroir answered the call on 12 May 2001 and proceeded to the intersection of Palmyra and Olympia Streets. (The intersection is one block from the victim's house). There he found "almost the whole neighborhood outside." He spoke to S.C., who positively identified the person being held as the man who raped her on 10 May 2001.
Frank Smith, III ("Mr. Smith"), the defendant's father, testified that his son was at home the entire night of 10 May 2001. Mr. Smith remembered that on 12 May 2001 his son went down the street to a friend's house. Sometime later someone knocked on the door to tell Mr. Smith that the police had his son. On the following Sunday, the police searched his house; they were looking for a sheet, plaid boxer *1157 shorts, a five dollar bill and a driver's license, but they took only a pair of boxer shorts belonging to Mr. Smith's nephew.
Ms. Vesta Smith, the defendant's mother, told the court that her son came home by nine o'clock in the evening on 10 May 2001. Mrs. Smith said it was unlikely that her son went out that night because he did not have a key to get out or back into the house.
Corey Davis, Smith's thirteen-year-old cousin, testified that he and his cousin share a room. Corey sleeps on the top bunk, and when he went to sleep about midnight on 10 May 2001, Frank was sitting on the bottom bunk talking on the telephone. The next morning Corey saw Smith fixing breakfast about seven o'clock. Corey stated that the back door is locked with a key and only Mr. Smith has the key.
Ms. Lisa Simoneaux, Smith's aunt, testified that she lived with her brother, his wife, and children during May of 2001. On 9 May 2001 she was working as a security guard and left her job about eleven o'clock in the evening and got home about one in the morning (on 10 May 2001). Smith was on the telephone when she got home. She recalled that because she wanted to use the telephone. She asked him for the telephone but he would not hang up. When she finally went to sleep after three o'clock in the morning, he was still on the telephone.
Smith took the stand. He said he was in the tenth grade at Fortier High School prior to his arrest; however, under cross-examination, he admitted he had quit going to school in April. He explained the scars on his face: he had been hit by a brick on the left side of his face, and he was injured on the right when he fell off a mo-ped. Smith said that his friend lives directly across the street from the victim, and he had seen her a couple of times. On the evening of 9 May 2001 he stayed outside until just about nine o'clock, when he went inside for the rest of the night. He argued with his aunt about using the telephone in the middle of the night. He denied ever assaulting, attacking, or accosting S.C. It is impossible to sneak out of his house at night, he said, because the doors are locked and only the adults have keys.

ERRORS PATENT
The record reflects no errors patent on the face of the record.

ASSIGNMENT OF ERROR
In a single assignment of error, Smith, though counsel, argues that his sentences are excessive. Smith received the maximum term on each of his offenses: fifty years on each of the two attempted aggravated rape convictions, twenty years on the aggravated oral sexual battery conviction, and ninety-nine years on the armed robbery conviction. All the sentences are imposed without benefit of parole, probation, or suspension of sentence, and all are to run concurrently.
Section 20 of Article I of the Louisiana Constitution explicitly prohibits excessive sentences. State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La. App. 4 Cir.1987). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, *1158 and is grossly out of proportion to the severity of the crime. State v. Johnson, 96-3041 (La.3/4/98), 709 So.2d 679. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 656 So.2d at 979.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record. State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189. If adequate compliance with La.C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Bonicard, 98-0665 (La. App. 4 Cir. 8/4/99), 752 So.2d 184, 185. However, in State v. Major, 96-1214 (La. App. 4 Cir. 3/4/98), 708 So.2d 813, this court stated:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
Id. at p. 10, 708 So.2d at 819.
In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, S 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982).
At the sentencing hearing the victim addressed the court. She said she has moved away from New Orleans because of her terrible memories of the incident. Furthermore, although she has had extensive counseling, she still misses work because of the impact of the rape. She stated that her sense of independence and personal security has been permanently affected. She suffers from insomnia and frequently feels a knot in her chest.
The court began the sentencing by stating that the case was very difficult because of Smith's agehe was sixteen at the time *1159 of the offense and seventeen at sentencing. The court noted that New Orleans lost a valuable citizen when the victim chose to leave the city as a result of the incident. Through his actions, Smith in effect sentenced the victim to a lifetime of painful memories.
The court next looked at the pre-sentencing investigatory report for Smith's criminal history. He was arrested in August of 1996 for theft and aggravated battery; he was arrested in September of 1996 and later convicted for possession of a stolen automobile; after being on probation for thirteen months, his probation was revoked in October of 1997; he was arrested again in October of 1996 for possession of a stolen auto and theft of an auto. In 1997 he was convicted of criminal damage in excess of $500. He was then sentenced to one year in the Department of Corrections. He was arrested on a battery charge in 2000; he had a burglary arrest in January of 2001, and in May of 2001 the incident at issue occurred.
The court stated that Smith's record indicated that any lesser sentences than the ones imposed would deprecate the seriousness of the offenses. Furthermore, if Smith were released, he would harm other people. The court addressed Smith:
This sentence may appear excessive or extreme to some but I believe it is the appropriate sentence for your conduct for the lives that you have ruined, not only those on the other side but also your own family for the things you put them through as a result of your criminal conduct. You know I gave you an opportunity to make a statement. The Probation Officer gave you an opportunity to make a statement in this Pre-Sentence Report. He said that you showed no remorse.... No feelings of sympathy or concern for the victim in this case. .... [T]here is no question about your involvement. You had an opportunity this morning to also express any concern or feelings that you may have which you have none. So I can only conclude from that that again there is still no remorse, ... no feelings of sympathy on your part for the action that you have done. Therefore, it is difficult for me to have any sympathy or any feelings for you with regard to this sentence. I am sorry for this sentence but I believe it is the only appropriate one that fits the facts and circumstances of this case as well as your criminal history.
The court then imposed the maximum sentences.
We find that the trial court's articulated reasons for the sentences amply support its imposition of the maximum terms for this defendant, who has committed violent crimes as well as property offenses. Consequently, we find no abuse of the trial court's broad sentencing discretion.
Accordingly, for the foregoing reasons, Smith's convictions and sentences are affirmed.

AFFIRMED.
JONES, J., dissents with reasons.
JONES, J., dissents with reasons.
While this is a horrible crime, the imposition of the maximum sentence upon this seventeen year old is also a crime.
The majority refers to Smith's extensive criminal record. However, he has two adult convictions, and both are for property crimes, not violent acts against the person.
The Supreme Court has far too often said that the maximum sentence should be imposed upon the worst offenders (cites omitted). Thus, because I do not believe that this seventeen year old is either the *1160 worst offender, nor is he capable at this young age of ever rehabilitating himself, we should not impose the maximum sentence. Therefore, I respectfully dissent.
NOTES
[1] La. R.S. 14:43.4 was repealed effective 15 August 2001, well before Smith's trial; however, defense counsel concedes that under La. R.S. 24:171, prosecution under a repealed statute is allowed as long as the offense occurred while the statute was in effect. The offense occurred on 10 May 2001.
[2] Because of the nature of the offense, the victim's initials are used in lieu of her name.