977 So.2d 1074 (2008)
STATE of Louisiana
v.
Antonio STOVALL.
No. 2007-KA-0343.
Court of Appeal of Louisiana, Fourth Circuit.
February 6, 2008.
*1076 Eddie J. Jordan, Jr., District Attorney, David S. Pipes, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES and Judge LEON A. CANNIZZARO JR.).
JOAN BERNARD ARMSTRONG, Chief Judge.
STATEMENT OF CASE
On November 10, 2004, the State filed a bill of information charging the defendant, Antonio Stovall, with three counts of armed robbery (counts 1, 4, and 5 of the bill), violations of La. R.S. 14:64.[1] He entered a not guilty plea on November 17, 2004. An Orleans Indigent Defender Program (OIDP) attorney was assigned to represent the defendant and his codefendants, Anthony Stovall and Dwight Love. On March 10, 2005, the State advised the court that there were issues pursuant to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and the court appointed separate counsel for each defendant. On April 27, 2005 the State entered a nolle prosequi as to four of the counts (counts 2, 3, 4 and 5  two counts each as to the defendant and Love), but stated its intent to prosecute count one, charging the defendant and the codefendants with armed robbery.
On May 13, 2005, the district court found probable cause and denied the motion to suppress the identification. A motion to suppress a codefendant's statement was denied on August 5, 2005, and the State elected to take the defendant and Love to trial before trying Anthony Stovall. A status hearing that was scheduled to occur on October 6, 2005 did not proceed because of the hurricane.[2] Trial was held on November 14, 2006. After a jury trial, the defendant was found guilty as charged. Sentencing was set and then reset to December 8, 2006. On that date, defense counsel orally moved for a new trial, and the court advised that the motion had to be filed in writing. The court reset sentencing to January 10, 2007. On that date the trial court denied the defendant's motion for a new trial. The trial court sentenced the defendant to twenty-five years at hard labor without benefit of probation, parole, or suspension of sentence to run concurrently with any other sentence imposed. The court noted that it was a crime of violence. On appeal, the defendant raises three assignments of error.
STATEMENT OF FACT
At the November 14, 2006 trial, Officer Nathan McGhee testified that on August *1077 31, 2004 he received a call relating to an armed robbery at 937 Marigny Street. When he arrived, the victim, Carl Mack, was lying on the ground. The victim said that he had been robbed and pushed down; his leg was injured. Paramedics responded and took the victim to the hospital. The officer said that he had obtained a description of the robbers and started to return to the station. On his way, the dispatcher put out a call relating to three subjects trying to get underneath a house near the robbery location. The description of the three suspects matched the description provided by the victim. The call occurred about five or ten minutes after clearing the crime scene. Officer McGhee responded to the 1100 block of Marigny Street, and he met a lady there. The officer observed two of the described robbers. One was attempting to remove a black duffel bag from underneath the house. Knowing that the individual matched the description of an armed robber, the officer stopped the subject and secured the duffel bag. When Officer McGhee checked inside the bag for safety reasons, he saw a gun fitting the victim's description of the weapon used during the armed robbery. The officer said that he then secured the bag and called for assistance. Another officer arrived and took the duffel bag. Officer McGhee testified that he apprehended three men; one was on the porch, one was on the ground underneath the house (Love), and one was inside the house (according to the lady who said she was the suspects' sister). When the third suspect exited the house, he had changed his clothes and placed them in a grocery bag.
Officer McGhee stated that the three suspects were placed in the back of the police unit and relocated to Tulane Hospital for a show-up with the victim. All three of the suspects were escorted individually into the hospital room, and the victim immediately identified them as the robbers. Officer McGhee advised the young men of their rights and arrested them for armed robbery.
On cross-examination, Officer McGhee testified that he authored the supplemental police report. Officer McGhee stated that there were three ways to conduct a lineup. An officer can use a six person photo lineup; he can use an on the scene showup; and he can use a single photo of a suspect. Officer McGhee stated that he used a show-up in this case, and the defendant was handcuffed (but not shackled) at the time. He said that the show-up occurred about five to ten minutes after the incident. Officer McGhee reviewed his report and provided the following description of the robbers. The victim had said that one subject was wearing a white T-shirt and dark pants, the second one was wearing a black shirt or red shirt and blue jeans. Officer McGhee did not have a third description in the report. The victim had said that the robbers appeared to be kids in height and size. When asked if he had documented that information, Officer McGhee said that he put it into the supplemental report, but then stated that the information was in the first incident report prepared by the uniformed officers at the scene. Officer McGhee identified clothing in the photos and then stated that he recovered some of the items from the defendant. When asked where that was documented, Officer McGhee read from his report that he observed Anthony Stovall with a plastic bag containing a red shirt on top of other clothing. When asked again, Officer McGhee said that he did not see the defendant with the bag or recover the bag from him. He admitted that the bag was not dusted for fingerprints.
Officer Mary Colon testified that on August 31, 2004 she responded to a suspicious person call and relocated to the 1200 block *1078 of Marigny Street. She met Officer McGhee, who had just pulled up. Officer Colon stated that two young subjects were in front of a house talking to a black female, and one subject was inside. She searched the defendant and found a twenty-dollar bill and several one-dollar bills in his right pants pocket and a one-dollar bill in his left pants pocket. She identified the photograph of the gun found inside the black bag that was on the side of the house; Dwight Love was removing the bag from underneath the house.
Mr. Warren Spears, Orleans Parish Criminal District Court supervisor of evidence and property, testified that originally a weapon and some clothing had been logged in under case 453-596. Mr. Spears had checked for the evidence in the case and found only a handgun. He could not locate the clothing, and the cash was under seal due to an investigation. He explained that the hurricane was the reason that the other evidence was not available.
Mr. Geoff Coates, who lived at 1209 Marigny Street with his fiancee, testified that late on the night of August 31, 2004 his dogs were running around and making a commotion. He went out behind the house and took his cell phone. He saw two kids ducking under his house, and another kid ducking under the house next door. Mr. Coates stated that he called 911 and yelled to the kids that he had called the police. The kids told him that they were staying with their sister next door and did not mean any harm; they were hiding so that they did not have to stay in the house. Mr. Coates told the kids they could not be under his house and reiterated that he had called the police. The kids walked to the front of the house, hopped the fence, and actually left briefly. He walked to his neighbor to tell him what was happening, and the kids returned and sat on their sister's front porch. Then the police arrived. He saw that the officers "pretty quickly" placed the kids into the police car (he was not sure if the car was marked or not).
Mr. Carl Mack, the robbery victim, testified that he owned the property on 939 Marigny Street. He had an entertainment company, a talent agency that sent out clowns, jugglers, and psychics for events. He also rented out about six apartments. His home was located at 937 Marigny Street. On August 31, 2004, he had worked in the morning and then planted some plants in the afternoon. He had dinner and then decided to go to Home Depot on Bullard Avenue to pick up more plants. At about 9:20 p.m., he stopped for gasoline at a Shell gas station, bought a bottle of water, and took out $40.00 from the ATM. He spent $12.00; therefore, he had about $28.00 left. He arrived home about 10:00 p.m., and he and his roommate decided to watch a movie. Mr. Mack then decided to drive to the Circle K to buy Gatorade and chips. About 10:30 p.m., he went to the front of the house. He opened the inside door, went into the foyer, and then opened the shutter door a little bit and stepped out. Mr. Mack saw three young men walking on the sidewalk from the river toward the lake. The first man was the defendant, who was wearing a green or dark blue parka. The defendant raised his shirt, which was a signal that there might be trouble. Mr. Mack said that he stepped back inside. Each of the three men looked up at him (actually his silhouette) as they walked by. Through the shutters he saw that the three had walked past the iron gate leading to his residence. He waited inside behind the locked door for about a minute and then went out on the porch. He said that he did not see the three men.
*1079 Mr. Mack testified that he went down the steps and approached his iron gate. When he opened the gate and stepped out on the street, he saw the defendant sitting on his stoop leaning against the house. Mr. Mack also saw the defendant's younger brother, Anthony Stovall, who was crouched down in front of the stoop, and Dwight Love, who was behind Anthony. Mr. Mack started running back up the steps of his residence; he lost his footing on the first step and banged his knee. As he ran up the steps, someone yelled that one of the three had a gun, and then Mr. Mack saw the gun. He made it up the steps and pulled at the door, which tended to stick in the summer. When Mr. Mack could not open the door, he felt a gun jabbed into his back as another young man started pulling on his shirt. One of the three pushed him, and he fell back off of the porch into the alley and broke his left leg.[3]
Mr. Mack stated that he took a step or two and fell to the ground as the three gathered around him. One of the men held the gun to his head and told him to get up and open up his house. Mr. Mack got up and attempted to take a step, but fell down again. One of the robbers put his hand over Mr. Mack's mouth and told him to get up and open up his house. When he made another attempt, he fell again. Mr. Mack then told them that he had broken his leg and asked them to just take his money. He pulled out his wallet and gave them all the money and put his wallet back into his pocket. The three then took off. Each of the three went through his gate and then ran up Marigny Street toward the lake. Mr. Mack said that he dragged himself under a pier, and then the littlest of the three, Anthony, returned with the gun.[4] Mr. Mack said that Anthony looked down the alleyway, could not see anything, and ran off.
Mr. Mack testified that he was able to get a look at all three young men. There were street lights at the corner and at the house next door, and he had a light on the front of his house. He identified the defendant. The victim stated that he realized that Anthony came back to kill him so that there was no witness. He waited about five more minutes to be sure that the three robbers would not return. Then Mr. Mack said that he dragged himself down the alley to the first patio door window, but no one answered when he knocked on the window. The victim then dragged himself to the next patio window, and his tenant, Joseph Rier, answered and let Mr. Mack inside. Mr. Rier called 911 and the victim's roommate. Mr. Mack testified that he told the police one man was wearing a green or dark blue parka; another one was wearing a reddish or orange shirt with blue pants; and the third one was wearing a white T-shirt with blue pants. He identified a semi-automatic revolver as the kind of gun the robbers used. The victim stated that the ambulance took him to Tulane University Hospital. Within about fifteen minutes, the police officers arrived and said that they had three suspects, which they wanted him to identify. The officers brought them one by one in front of him. Mr. Mack testified that he *1080 was able to identify one of the suspects as the man who took the money, one of the suspects as the one with the gun, and one as the lookout. Mr. Mack said that he thought the defendant, was the lookout, the one standing behind him who was handed the money. He thought that Anthony Stovall put the gun to his head, and Dwight Love stayed in front of him. Because his glasses had been lost (and he was nearsighted), Mr. Mack asked the officers to place the suspects closer to his hospital bed. The officers had the suspects stand at the foot of the victim's bed, and he was able to "lean forward to make sure" that he could "see them well." Mr. Mack stated: "And yes, absolutely, there is no doubt in my mind that the three boys that they brought in that night were the same three boys that robbed me."
Mr. Mack clarified that he was wearing his glasses when he left the house and saw the three walking down the sidewalk. He assumed that he lost the glasses when he was pushed off the porch. When Mr. Mack was being robbed, the three men were standing very close to him. He did not recognize the three young men at the time of the robbery. When he was discharged from the hospital about two weeks after the robbery and went home, the victim read the police report for the first time. When Mr. Mack read the Stovall brothers' names, he felt that he knew them. He checked the database for his entertainment company and found Antonio and Anthony Stovall listed as tap dancers; the two brothers (at around twelve years old) had worked a few jobs in 2000 and 2001 as the Bourbon Street Tappers, along with two other boys. The brothers had attended a couple of dance classes with the victim, and the victim had taken them to a couple of jobs at hotels. Mr. Mack said he did not recognize the brothers on the night of the armed robbery because it had been four years since he had seen them.
On cross-examination, Mr. Mack reiterated that he knew the Stovall brothers. They had never been trouble when they were dancing for him. He said that the area was well lighted even at night. There was a hotel next door with lights on all the time. There were street lights, his light on his porch, and flood lights on the house across the street. The victim denied recognizing the Stovall brothers at the time of the robbery. He reiterated that he fell on the first step and was then pushed from the porch and broke his leg. He said that he did not recall if he had his glasses after the fall. Mr. Mack said that he was fighting back until he saw the gun. He said that Anthony Stovall and Dwight Love had followed him up the stairs; the defendant was at the bottom of the stairs. Mr. Mack testified that when he pulled out the cash, the defendant had moved in and he handed the money the him. Mr. Mack identified the defendant's booking photo. He stated that once he was on the ground, Love was crouching down about a foot from his face, the defendant was about three feet behind them, and Anthony was holding the gun to Mr. Mack's head. The victim stated again that he thought he gave the money to the defendant, who was wearing the parka. When the three were walking on the sidewalk, the defendant was the first one. He was also the one leaning against the house.
Mr. Mack testified that, upon his dad's arrival at the hospital about seven days after the robbery, his dad said that he thought the robbers were tap dancers hired by the victim years before. The victim said that his father may have been correct; the suspects looked familiar. Mr. Mack said that he did not recall if he alerted the police; he may have told a nurse at the hospital. The victim then mentioned his May 13, 2007 testimony at the hearing on the motion to suppress the *1081 identification where he said that alot of kids in the neighborhood looked familiar because the Robert's supermarket was across the street. He admitted that he told the officers to put the suspects closer at the show-up at the hospital; his vision was blurry after five feet. The lighting was very bright at the hospital, and he had the officers place the suspects so that he could really see their faces. Mr. Mack identified the one with the gun, the one with the money, and the lookout. He said the gun was a small, black semi-automatic revolver. He did not recall whether he told the officers that the perpetrator had dreadlocks.
Ms. Anthneacka Stovall, the defendant's sister, testified for the defense. She stated that she lived in the 1200 block of Marigny Street, and she was at home playing cards with her dad, sister-in-law, and cousin on the night of the robbery. She said that, when the defendant went out the door, she followed him and told him not to leave. Antonio was on the porch when she went inside. Then the defendant and Anthony started playing; they were knocking on the doors and windows. Although she could not see her brothers, she could hear them. Ms. Stovall stated that about fifteen minutes would pass between a knock at the door and a knock at the window. She stated that she had played the game of knocking on a door and running; it was an established game. He knocked once on the door, and he knocked once on the window.
On cross-examination, Ms. Stovall admitted that on the night of the robbery, she told the police officers that she had lost track of her brothers earlier that night when they ran from her house until they returned later on. She admitted that she had told officers that she had chased her brothers from the house.
ERRORS PATENT/ASSIGNMENT OF ERROR NUMBER 3
A review of the record for errors patent reveals one error. The defendant's motion for a new trial was denied on January 10, 2007, and the trial court sentenced him on that same date.
La.C.Cr.P. art. 873 provides in pertinent part: "If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately." In State v. Williams, XXXX-XXXX (La.App. 4 Cir. 4/13/05), 901 So.2d 1171, writ denied, XXXX-XXXX (La.1/13/06), 920 So.2d 236, this Court discussed the jurisprudence relating to this article:
In State v. Collins, 584 So.2d 356 (La. App. 4th Cir.1991), this Court discussed the Augustine case as follows:
In State v. Augustine, 555 So.2d 1331 (La.1990), the Supreme Court held that the trial court's failure to observe the twenty-four hour delay did not constitute harmless error, even if the defendant did not raise that issue as error on appeal, where the defendant challenged his sentence on appeal. In the present case, defendant does not challenge his sentence and he does' not raise as error the failure of the trial court to wait twenty-four hours before imposing sentence. Therefore, this error is harmless.
In State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, the Louisiana Supreme Court distinguished that case because of the mandatory nature of the death sentence in the first, degree murder case, and the fact that no prejudice could be shown for the failure to wait twenty-four hours before sentencing. *1082 The Court held: "Absent a showing that prejudice resulted from the failure to afford the statutory delay, reversal of the prematurely imposed sentence is not required." Id., at p. 17, 684 So.2d at 380. Where the sentence to be imposed is mandatory and not within the trial court's discretion, this Court has held that the failure to observe the delays in sentencing is harmless error. State v. Davis, 2002-2061, p. 14 (La.App. 4 Cir. 10/8/03), 859 So.2d 776, 784; State v. Allen, 94-1895 (La. App. 4 Cir. 9/15/95), 661 So.2d 1078, 1083. If the defendant has not challenged his sentence, and he does not raise as appellate error the failure of the trial court to wait twenty-four hours before imposing sentence, the error is harmless. State v. Williams, XXXX-XXXX, p. 5 (La.App. 4 Cir. 12/10/03), 863 So.2d 652, 655, unit denied, XXXX-XXXX (La.6/4/04), 876 So.2d 75.
Id. at pp. 9-10, 901 So.2d at 1176-77, quoting State v. Gibson, XXXX-XXXX, p. 6 (La.App. 4 Cir. 2/4/04), 867 So.2d 793, 797. See also State v. Riley, XXXX-XXXX (La.App. 4 Cir. 9/20/06), 941 So.2d 618; State v. Ashford, XXXX-XXXX (La.App. 4 Cir. 6/16/04), 878 So.2d 798. A defendant may implicitly waive the twenty-four hour delay by responding in the affirmative when the court asks if the defendant is ready for sentencing. State v. Pierre, 99-3156, p. 7 (La.App. 4 Cir. 7/25/01), 792 So.2d 899, 903.
In State v. Foster, XXXX-XXXX, pp. 3-4 (La.App. 4 Cir. 12/11/02), 834 So.2d 1188, 1192, this Court discussed exceptions to the requirement that sentences be vacated and the cases remanded for resentencing where the failure to observe the twenty-four hour delay is considered harmless:
[F]ailure to observe the twenty-four hour period has been considered harmless where there is a sufficient delay between the date of conviction and the date of sentencing; there is no indication that the sentence is hurriedly imposed and; there is no argument or showing of actual prejudice by the failure to observe the twenty-four hour delay. State v. Sam, XXXX-XXXX, p. 8 (La. App. 4 Cir. 4/19/00), 761 So.2d 72, 78, writ denied, XXXX-XXXX (La.9/14/01), 796 So.2d 672 (delay between conviction and sentencing just under one month); State v. Dickerson, 579 So.2d 472, 484 (La. App. 3 Cir.1991), writ granted in part, 584 So.2d 1140 (La.1991) (delay between conviction and sentencing over one month). But cf., State v. Brauner, 99-1954 at p. 14, 782 So.2d at 63 (requiring that sentence be vacated notwithstanding over six months between conviction and sentencing).
Foster, XXXX-XXXX, pp. 3-4, 834 So.2d at 1192.
In Foster, 834 So.2d at 1192, the defendant filed motions for new trial and in arrest of judgment prior to sentencing. The defendant was sentenced on the very same day that those motions were denied. There was no indication that defendant waived the twenty-four hour delay, either expressly or implicitly. On appeal, the defendant raised not only the issue of excessive sentence, but also the trial court's failure to observe the twenty-four hour delay as an assignment of error. This Court noted that nine days elapsed between the date of conviction and the date of sentencing. This Court concluded:
Given our review of the jurisprudence as well as the circumstances of this case, we do not find that a sufficient delay transpired such that the failure of the trial court to observe the twenty-four hour delay mandated by La. C. Cr. P. article 873 constitutes harmless error. We therefore find that the failure of the trial court to observe the mandatory *1083 twenty-four hour delay requires that the sentence be vacated and the case remanded to the trial court for resentencing.
Id. at p. 4, 834 So.2d at 1192.
In State v. Hayden, 98-2768, p. 5 (La. App. 4 Cir. 5/17/00), 767 So.2d 732, 738, the defendant's motion for new trial was made on May 16, 1997, the same day he was adjudicated a fourth felony offender and sentenced to the mandatory sentence, life imprisonment. This Court stated that the defendant was not prejudiced by the failure to observe the delay for sentencing under La.C.Cr.P. art. 873 because his sentence was mandatory. Additionally, this Court noted that defense counsel answered affirmatively when asked by the trial court if the defendant was ready for sentence after he was adjudicated a fourth felony offender. This Court concluded:
Although the defendant challenges his sentence on grounds of excessiveness, he has failed to show any prejudice from the failure to observe the delay. Defendant was not prejudiced because the sentence imposed was mandatory. Furthermore, by indicating his readiness for sentencing, the defendant implicitly waived the twenty-four hour delay for sentencing.
Hayden, p. 6, 767 So.2d at 738.
In State v. Jefferson, 97-2949, pp. 5-6 (La.App. 4 Cir. 4/21/99), 735 So.2d 769, 772-73, the minute entry of the November 20, 1996 trial showed that at the same time of the conviction, the trial court ordered a presentence investigation, which was due on January 20, 1997. Jefferson filed a motion for new trial on February 5, 1997. On June 2, 1997, the trial court denied Jefferson's motion for a new trial and sentenced him. This Court noted that over three months elapsed between the conviction and the sentence. This Court stated that there was no indication that Jefferson's sentence was hurriedly imposed, and Jefferson did not argue or in any way show that she was actually prejudiced. Even though Jefferson had assigned as error an excessive sentence, this Court decided that there was a sufficient delay between the date of conviction and the date of sentencing to be harmless error where no prejudice was shown. Id.
In the instant case, the defendant does not raise as an assignment of error the failure of the trial court to wait twenty-four hours before sentencing him. However, he does assign as error that his sentence of twenty-five years without benefit of probation, parole, or suspension of sentence is excessive. The transcript does not indicate that the defendant expressly waived his right to a twenty-four-hour delay between the denial of his motion for new trial and the imposition of sentence. After denying the defendant's motion for a new trial, the court asked: "Does your client have anything to say before I impose sentencing?" Defense counsel responded: "No, Your Honor." The minute entry in the record indicates that the defense announced readiness for sentencing. However, generally, where there is a discrepancy between a minute entry and a transcript, the transcript prevails. State v. Hall, 99-2887, p. 17 (La.App. 4 Cir. 10/4/00), 775 So.2d 52, 63.
Unlike Foster, 834 So.2d at 1192, here the defendant does not assign as error the, failure to delay the sentencing and does not argue or show that he was prejudiced. Unlike Foster (where the defendant was sentenced nine days after his conviction), almost two months elapsed between the defendant's conviction and sentencing. Unlike Pierre, 792 So.2d 899, and Hayden, 767 So.2d 732, cases where the court asked if the defense was ready for sentencing and then imposed a mandatory sentence, here no sentence was mandatory, and the *1084 trial court asked if the defendant wanted to say anything before sentencing. However, arguably, this Court could rely on Pierre and Hayden to conclude that defense counsel's response to the court's question without further comment could be considered an implicit waiver of the twenty-four hour delay.
Relying on Jefferson, 735 So.2d 769, this Court can conclude that there was no indication that the defendant's sentence was hurriedly imposed; the defendant was convicted on November 14, 2006, and almost two months elapsed before sentencing on January 10, 2007. The defendant did not assign as error the failure to delay sentencing twenty-four hours and did not argue or show that he was actually prejudiced. Under Jefferson, it appears that there was a sufficient delay between the date of conviction and the date of sentencing to be harmless error where no prejudice was shown.
ASSIGNMENT OF ERROR NUMBER 1
The defendant argues that the trial court erred by denying his motion to suppress the identification. He contends that the "show-up" was hopelessly tainted and suspect; the circumstances were peculiarly suggestive.
Generally, the defendant has the burden of proof on a motion to suppress an out-of-court identification. La. C.Cr.P. art. 703(D). To suppress an identification, a defendant must first prove that the identification procedure was suggestive and that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Leger, XXXX-XXXX, p. 59 (La.7/10/06), 936 So.2d 108, 151, cert, denied, ___ U.S. ___, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2/20/07), citing State v. Higgins, XXXX-XXXX, p. 19 (La.4/1/05), 898 So.2d 1219, 1232-33.
The law as to identification procedures was set out in State v. Holmes, XXXX-XXXX (La.App. 4 Cir. 5/10/06), 931 So.2d 1157:
An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the relator. State v. Robinson, 386 So.2d 1374, 1377 (La. 1980). Moreover, a relator who seeks to suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentification existed as a result of the identification procedure. State v. Valentine, 570 So.2d 533 (La. App, 4 Cir.1990).
The Supreme Court has held that even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99); 750 So.2d 916, 932. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517. If a suggestive identification procedure has been proved, a reviewing court must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification at trial. State v. Martin, 595 So.2d 592, 595 (La.1992). The U.S. Supreme Court has set forth a five factor test to determine whether a suggestive identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) *1085 the witness's degree of attention; (3) the accuracy of the witness's prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brothwaite, Id. The corrupting effect of the suggestive identification itself must be weighed against these factors. Martin, 595 So.2d at 595
In evaluating the defendant's argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Lewis, XXXX-XXXX (La.App. 4 Cir. 9/29/04); 885 So.2d 641, 652. A trial court's determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Offray, XXXX-XXXX (La.App. 4 Cir. 9/26/01); 797 So.2d 764.
Holmes, XXXX-XXXX, pp. 6-7, 931 So.2d at 1161. See also State v. Galle, XXXX-XXXX, p. 5 (La.App. 4 Cir., 5/18/05), 904 So.2d 773, 776, writ denied, XXXX-XXXX (La.1/27/06), 922 So.2d 546, cert. denied ___ U.S. ___, 127 S.Ct. 115, 166 L.Ed.2d 84 (10/2/06).
In State v. Harold, XXXX-XXXX (La.App. 4 Cir. 11/12/03), 861 So.2d 262, this Court set out the relevant jurisprudence relating to a "one-on-one show up":
The Louisiana Supreme Court has considered the admissibility of one-on-one identifications in several cases. In State v. Bickham, 404 So.2d 929 (La.1981), the Supreme Court stated as follows:
One-on-one confrontations between a suspect and a victim, while not favored by the law, are permissible when justified by the overall circumstances. State v. Dunbar, 356 So.2d 956 (La.1978). Such identification procedures are generally permitted when the accused is apprehended within a short time after the offense and is returned to the scene of the crime for on-the-spot identification. A prompt in-the-field identification, under appropriate circumstances, promotes accuracy, as well as expediting the release of innocent suspects.
Id. at 934. See also State v. Williams, 420 So.2d 1116 (La.1982); State v. Frank, 344 So.2d 1039 (La. 1977).
Additionally, the determination of whether a one-on-one show up is not impermissibly suggestive such that the reliability of the identification is impaired is to be based on the totality of the circumstances surrounding the identification. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In State v. Dunbar, 356 So.2d 956 (La. 1978), the Louisiana Supreme Court stated with respect to one-on-one show up identifications that "identifications made in this manner are permissible when justified by all of the circumstances." 356 So.2d at 962. See also, e.g., State v. Dauzat, 364 So.2d 1000 (La.1978); State v. Frank, 344 So.2d 1039 (La.1977);
This Court has also approved one-on-one show up identifications where the identifications have been found to be reliable and the procedure did not create a substantial likelihood that the suspect would be misidentified. See, e.g., State v. Haynes, XXXX-XXXX (La.App. 4 Cir. 4/30/03), 847 So.2d 653; State v. Vicks, XXXX-XXXX (La.App. 4 Cir. 9/26/01), 798 So.2d 308; State v. Nogess, 98-0670 (La. App. 4 Cir. 3/3/99), 729 So.2d 132; State v. Jackson, 94-0436 (La.App. 4 Cir. 6/29/95), 657 So.2d 1391.
In the Bickham case, the Louisiana Supreme Court enunciated the standard *1086 of review to be used by an appellate court in cases involving the admissibility of a one-on-one show up identification of a defendant. The Supreme Court stated that "[a] trial judge's determination on the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion." 404 So.2d at 934. See also State v. Haynes, XXXX-XXXX (La.App. 4 Cir. 4/30/03), 847 So.2d 653; State v. Offray, XXXX-XXXX (La.App. 4 Cir. 9/26/01), 797 So.2d 764.
State v. Harold, XXXX-XXXX, pp. 7-8, 861 So.2d at 266-67. Show up identifications have been found to be admissible when the identification occurred in close proximity to the time of the offense, and the suspect is presented for immediate identification. State v. Felton, XXXX-XXXX, p. 4 (La.App. 4 Cir. 10/8/03), 859 So.2d 817, 819, citing State v. Robinson, 404 So.2d 907 (La.1981).
Here, Mr. Mack, the victim, testified at the motion to suppress hearing and the trial that he waited about five minutes after the robbery before alerting a neighbor, who called 911; within fifteen minutes of his arrival at the hospital the police officers showed up with suspects, which he then identified as the three robbers. Therefore, the three suspects were placed in front of the victim within thirty minutes of the armed robbery.
Mr. Mack testified at the hearing and the trial that he watched each one of the young men walk single file down the sidewalk past his house; he looked at each "straight in the eye." He said that each one looked at him. Mr. Mack stated that there were street lights and the light on the front of his house; it was a well-lighted area. The victim admitted that when the first young man was placed before him at the hospital, he asked that the suspect be placed closer because he was nearsighted and had lost his glasses when he fell from the porch. Mr. Mack identified each of the suspects when they stood at the edge of the bed where the victim could see in very clear focus; he identified the one who took the money, the one with the gun, and the lookout. The victim clearly testified that there was no doubt in his mind that the suspects he identified in the hospital were the armed robbers. By the time of the motion to suppress hearing, he had read the police report and realized that he knew the defendant and Anthony Stovall as kids he had employed as tap dancers through his entertainment company years before. Mr. Mack identified the three in court at the motion to suppress hearing and at trial.
Although the defendant takes issue with the show-up at the hospital, such identifications are permitted when, as here, the perpetrators were apprehended within a short time after the offense and were taken to the victim being treated at the hospital; the show up was justified under the overall circumstances. After considering the five factors set out in Manson v. Brathwaite, 432 U.S. at 98, 97 S.Ct. at 2243, the out-of-court identification was not suggestive and thus did not deprive the defendants of their due process rights. The trial court did not err by denying the motion to suppress the identification. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER 2
The defendant argues that his sentence is excessive. He claims that he was very young at the time of the offense, and the evidence suggested that he was at the worst only assisting others in the armed robbery. The defendant argues that there was no evidence that he physically assaulted Mr. Mack. Therefore, the *1087 twenty-five year sentence was clearly excessive.
In State v. Scott, XXXX-XXXX (La.App. 4 Cir. 7/27/05), 913 So.2d 843, writ denied, XXXX-XXXX (La.10/13/06), 939 So.2d 356, this Court summarized the law relating to the issue of an excessive sentence:
Article I, Section 20 of the Louisiana Constitution of 1974 provides that "No law shall subject any person . . . to cruel, excessive or unusual punishment." A sentence within the statutory limit is constitutionally excessive if it is "grossly out of proportion to the severity of the crime" or is "nothing more than the purposeless imposition of pain and suffering." State v. Caston, 477 So.2d 868 (La.App. 4 Cir.1985). Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983); State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181.
If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, 424 So.2d 1009 (La.1982).
If the judge records the factors affecting his sentencing decision, the sentence should not be set aside as excessive unless it is grossly disproportionate to the offense or represents nothing more than the needless infliction of pain and suffering. State v. Pike, 426 So.2d 1329, 1335 (La.1983).
Scott, XXXX-XXXX, pp. 13-14, 913 So.2d at 851-52. On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate, but whether the trial court abused its broad sentencing discretion. State v. Smith, 2001-2574, pp. 6-7 (La.1/14/03), 839 So.2d 1, 4. The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D); State v. Smith, 2002-2340, p. 9 (La.App. 4 Cir. 3/12/03), 842 So.2d 1153, 1158, citing State v. Major, 96-1214 (La. App. 4 Cir. 3/4/98), 708 So.2d 813.
Under La. R.S. 14:64, the penalty for armed robbery is a sentence at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence. The defendant's sentence is within the statutory range.
According to the sentencing transcript, the trial court recounted the facts. The defendant with others demanded the victim's money and wallet. One of the robbers was armed with a handgun. During the robbery, one of the robbers knocked the victim off his front porch, and he sustained an injury that required surgery. The court noted: "In this case, the victim, [sic] received a protracted and very painful injury that required significant and involved medical care over a lengthy period of time." The court stated that it had considered the provisions of La.C.Cr.P. art. 893 and found that suspension or a deferred sentence was prohibited by law, that armed robbery was a crime of violence pursuant to La. R.S. 14:2, and that the sentence for a crime of violence, specifically armed robbery, could not be suspended, deferred or probated.
The trial court declared that it was cognizant of La.C.Cr.P. art. 894.1 and applied its provisions as follows. The court considered *1088 the nature of the crime, including the fact that three co-perpetrators attacked one person and threatened deadly or great bodily harm if the victim did not comply with their demands. The court found that there was an undue risk that during a period of a suspended sentence or probation, the defendant would commit another crime. It found that the defendant was in need of correctional treatment or a custodial environment, which could be most effectively provided by his commitment to an institution, specifically, Angola. The court found that any lesser sentence would deprecate the seriousness of the defendant's crime. It found that the defendant, along with his co-perpetrators, manifested a deliberate cruelty to the victim, who was known to be particularly vulnerable due to his advanced age. The court stated that the attack of three young men against one older victim put the odds against the victim being able to get away or to defend himself. The court declared that the defendant and the others used threats or acts of violence in the commission of the crime, and a dangerous weapon was used. The court concluded that the offense resulted in a significant, permanent injury to the victim.
The trial court further stated: "However, I also take into consideration the defendant's age at the time of the occurrence of the offense and the fact that the state has not presented any information to this court to lead the court to believe that he was a convicted felon at the time of the offense."
Here the trial court adequately complied with La.C.Cr.P. art. 894.1. The court considered the factors listed in the sentencing guidelines and noted the gun, the threats, and the serious injury to the victim. The court also stated the factual circumstances of the armed robbery and considered the actions of the defendant and his co-perpetrators when deciding on the appropriate sentence.
The defendant's sentence is not excessive when compared to other armed robbery sentences upheld by this Court and the Louisiana Supreme Court. In State v. Wix, XXXX-XXXX (La.App. 4 Cir. 1/15/03), 838 So.2d 41, this court upheld two thirtyseven-year sentences for two counts of armed robbery where the defendant accosted the victims on the street, brandished a gun, and robbed them. In State v. Smith, 2001-2574, 839 So.2d 1, the Supreme Court considered whether the defendant's forty-year sentence for armed robbery was excessive. The Court stated:
This sentence is within the thirty-five to fifty-year range this Court has found acceptable for first offenders convicted of armed robbery. State v. Thomas, 98-1144, p. 2 (La.10/9/98), 719 So.2d 49, 50; State v. Augustine, 555 So.2d 1331, 1332 (La. 1990) and the cases cited therein.
Smith, 2001-2574, p. 7, 839 So.2d at 4. The Court found that the trial court considered that the defendant aimed a firearm at six persons in a store and jeopardized their lives. It found that the trial court did not abuse its broad sentencing discretion. Id. See also State v. Thomas, 98-1144, p. 2 (La.10/9/98), 719 So.2d 49, 50. In State v. Scott, 913 So.2d 843, this Court upheld ninety-nine-year sentences for six counts of armed robbery, where all the victims were robbed as they were getting out of their cars with children, and guns were placed at the children's heads. See also the cases cited therein.
This assignment of error lacks merit.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] In this case the defendant and his codefendant, Dwight Love, were each charged with three counts of armed robbery; the State nolle prosequied two counts as to each defendant. The other codefendant, Anthony Stovall, was charged with one count of armed robbery. This case is the reinstitution of case number 452-567, which was nolle prosequied by the State on November 15, 2004. In that case, the defendant was charged with two counts of armed robbery, but the State nolle prosequied the case.
[2] The defendant filed several pro se pretrial writ applications in this case. In writ 2006-K-0170, the defendant sought a court date or to be released from custody. Writ 2006-K-0194 was granted in part and transferred to the district court for consideration as a motion for speedy trial; his claims seeking to have the charges quashed were denied. A second order to consider the motion for speedy trial was issued in writ 2006-K-1248. A third order was issued in writ 2007-K-0217.
[3] At the motion to suppress hearing, Mr. Mack stated that he tried to "keep moving" as he felt his shirt being pulled and the gun in his back. He said that he "jumped off" his porch; however, Mr. Mack also stated: "It's possible they contributed to that by pushing me off the porch."
[4] At the motion to suppress hearing, Mr. Mack said that the younger Stovall brother (he believed it was Antonio) returned and stood looking for him. Later on, he stated that Anthony was the one with the gun. At trial, the victim testified that the younger brother with the gun was Anthony.